OPINION OF THE COURT
Harold Tompkins, J.
The right of homeless families to emergency shelter requires provision of an environment free from health dangers. This issue arises out of the plaintiffs’ application for a preliminary injunction to close the Catherine Street Shelter for the Homeless.
BACKGROUND
The Catherine Street Shelter is a former schoolhouse built *97 in 1908. In December 1985, the city began using it as a shelter for homeless families. The plaintiffs initiated this proceeding on April 17, 1986, seeking to relocate the families resident in the shelter and to restrain further placement in the shelter. The court was presented with evidence of massive cracking, chipping and peeling of lead-based paint as well as asbestos fibers, lack of a sprinkler system and lack of adequate lavatory facilities. High concentrations of lead in chipping and falling lead paint posed an immediate health threat to the residents, particularly to those residents with children under seven years of age. After hearing oral argument from representatives of the Corporation Counsel and the Attorney-General, as well as the plaintiffs, the court signed an order to show cause containing a temporary restraining order that directed immediate relocation of the resident families and further enjoined placement in the shelter.
Immediately thereafter the city engaged in extensive renovations of the Catherine Street facility. Contracts were let out on an emergency noncompetitive basis at the cost of approximately $2.04 million, the additional cost of overtime payments to the city’s own personnel. Over the entire shelter, friable lead paint was scraped off all surfaces. The surfaces were then repainted with two coats of oil paint and two coats of vinyl paint. The vinyl paint has the effect of bonding and sealing the surface. Radiator covers were installed. New water lines, smoke alarms, showers, sinks and tubs were also included in the renovation. The floors were sanded and scraped and then covered with two coats of polyurethane or plaster and tiles.
The emergency assistance unit (EAU) on the first floor, which serves as an intake and assignment area, was completed lead abated. The lead paint was treated with a chemical solvent known as peel away and the walls were sheet-rocked. Dropped ceilings completed the total abatement. As a result of the repairs, it was stipulated that issues in controversy were reduced to the adequacy of the lead abatement in that portion of the Catherine Street Shelter outside the EAU.[1] The cost of abating the lead hazard in the same manner as *98 the EAU would be approximately $5.8 million. The city chose to institute a thorough and continuous inspection, maintenance and repair program. The city also determined to restrict entry by preventing placement of families with children under seven years old and of families with any member who is pregnant. On August 29, 1986, after presentation of evidence on the scope of the renovation, the court vacated the temporary restraining order and permitted Catherine Street to be reopened.
On September 4, 1986, the court and all counsel visited and inspected the shelter. Thereafter, in September and October 1986, and January 1987, the court conducted hearings on the dangers of lead-based paint and the adequacy of the renovation and the maintenance schedule. The plaintiffs doctors, John Rosen, Richard Wedeen and Sergio Piomelli, testified to the effects of lead paint. The severe effects of lead include kidney disease, hypertension, and particularly in children, retardation of neurological development. They cited the Center for Disease Control guides and the Second National Health and Nutrition Examination Survey to require complete abatement by sheetrocking or otherwise encapsulating surfaces that contain lead-based paint. They foresaw inevitable chipping paint as a result of natural human interaction. The chipping paint would fall to the floor, be pulverized, and lead dust would be spread through the shelter and be ingested.
In response the city called Drs. Julian Chisolm and Steven Mehran; the City Commissioner of Health, Dr. Stephen Joseph; Melvin Hester, executive deputy administrator of HRA in charge of renovations; the shelter manager, Brendan Collins; and the maintenance chief. The renovations were extensively testified to by Mr. Hester. He stated that Catherine Street was designed as a model shelter and the renovations were conducted to dovetail with the maintenance plan. The shelter manager, Mr. Collins, and the maintenance manager advised that there was a daily inspection of the shelter for chipping and peeling paint with a repair staff on 24-hour duty. Repainting or repairs were able to be made daily as needed. Thirty-eight institutional aides were on staff to thoroughly clean the shelter, including wet mopping the halls three times daily, and the residents’ rooms once daily and the bathrooms hourly. The medical testimony from both Drs. Chisolm and Mehran found the shelter to be generally safe for occupancy. They stated that the principal danger of lead paint ingestion is pica, hand-to-mouth activity engaged in by children under *99 seven, and additionally by mentally retarded persons. The city consented to not placing families with mentally disturbed members, or with children under seven, or with pregnant women owing to their greater sensitivity.[2]
The medical testimony offered by the city approving the shelter as safe for occupancy was contingent upon the aggressive, intensive maintenance program outlined in testimony and the short-term duration of stay lasting 30 days.[3] The plaintiffs presented evidence that the maintenance was not fully implemented and that residents were staying in the shelter longer than the 30-day period.
STATUTORY AND REGULATORY MANDATES ON LEAD PAINT
Administrative Code of the City of New York § 27-2013 et seq. (formerly § D26-12.01) provides that an owner shall remove or cover in a manner approved by the Department lead-based paint with a concentration of .5% of metallic lead in any unit in which children six years or younger reside. New York City Health Code § 173.13 similarly prohibits use of paint with a concentration higher than .5% of lead in a dwelling where children under seven years old reside. The Health Department has the authority to order removal and refinishing or covering of surfaces in a manner it deems appropriate to protect the life and health of the occupants. Pursuant to Public Health Law § 206 (1) (n), the State Commissioner of Health has enacted regulations on lead poisoning authorizing inspection of a building in which a child under seven tests as lead poisoned and removal of peeling, chipped, cracking paint more than 1% concentration of lead (10 NYCRR part 67).
Restriction of the Catherine Street Shelter to families with *100 children seven years of age or older makes the regulatory provisions noted above inapplicable. Additionally, the regulations provide discretion as to the manner in which lead abatement is to occur.
Injunctive relief may only be issued where there is irreparable harm, a favorable balance of the equities and a likelihood of success on the merits (Gulf & W. Corp. v New York Times Co., 81 AD2d 772 [1st Dept 1981]; Little India Stores v Singh, 101 AD2d 727 [1st Dept 1984]). The movant must establish a clear right to relief. Further, the court will defer to the expertise of an administrative agency (Matter of Community Action Against Lead Poisoning v Lyons, 43 AD2d 201 [3d Dept 1974]).
Lead paint ingestion and the associated health problems of kidney disease, increased risk of cardiovascular disease and stroke amount to irreparable harm. Inasmuch as the individuals involved are being placed in an environment by governmental agencies, the court also finds that the plaintiffs have established a favorable balance of the equities.
THE RIGHT TO SHELTER
There is an affirmative governmental obligation to provide aid to the needy and this duty requires the provision of emergency shelter (NY Const, art XVII, § 1; Palmer v Cuomo, 121 AD2d 194 [1st Dept 1986]). The specific manner in which the government fulfills this obligation is generally a matter of legislative and administrative discretion (Tucker v Toia, 43 NY2d 1 [1977]; Matter of Bernstein v Toia, 43 NY2d 437 [1977]).
While it is not appropriate for a court to determine minimum standards of comfort and other amenities, this case involves potentially severe threats to health resulting from the manner in which the city provided shelter. This court believes that implicit in the term shelter is a requirement that the individuals involved not be placed in a situation directly threatening to their health. The city must fulfill its obligation to shelter the homeless by placement in a shelter that does not risk their health.
Recently, the Court of Appeals has held that the Supreme Court has the equitable power to enforce minimum standards of habitability (McCain v Koch, 70 NY2d 109, revg 117 AD2d 198 [1st Dept 1986]). This court believes that the plaintiffs’ *101 entitlement to shelter necessarily includes the right to be sheltered free of potentially significant health threats.
Class certification is generally inappropriate when the relief sought is against a governmental agency (Williams v Blum, 93 AD2d 755 [1st Dept 1983]). The court believes the doctrine of stare decisis is adequate to protect the rights of future claimants in this case.
Analyzing the matter by the above principles and cognizant of its limited role in reviewing conflicting factual matters involving public health, the court finds that the city’s plan for operation, inspection, repair and maintenance is acceptable. However, the city[4] must live up to the plan it established (McCain v Koch, supra). The medical witnesses on behalf of the city conditioned their acceptance of the shelter on the repair and maintenance program and a length of stay of 30 days. The city must also take appropriate steps in the form of signs to insure that pregnant women with their greater susceptibility are excluded from the shelter (see, n 2). The court must therefore adapt its order to this medical evidence.
This court grants the plaintiffs’ application for a preliminary injunction to the extent of:
(A) Prohibiting placement in the Catherine Street Shelter of families for more than 30 days;
(B) Prohibiting the placement in the Catherine Street Shelter of families with a child under seven years old or families with a pregnant woman or families with a member who is mentally retarded;
(C) Directing the city to apply the maintenance and inspection plan outlined in open court, including a 24-hour maintenance crew, daily inspection, wet mopping by the staff of public areas three times daily and wet mopping by the staff of the residents’ rooms daily;[5]
(D) Directing the city to prominently display signs in En *102 glish and Spanish to advise that pregnant women and their unborn children are at risk if they remain at the shelter and they must report to their social worker.
The court has advised counsel for all parties of this decision and has advised that copies are available in chambers.

. Additionally, the plaintiffs raised the question of the adequacy of the tests performed on the 96 children under age seven who resided at the shelter prior to closure pursuant to the court’s order in April 1986. The tests revealed only one child in the lead-poisoned range and that child was given follow-up testing and treatment. The court believes that the test given was reasonably calculated to screen for the potential harm and finds no additional testing is warranted.

. In the hearing on January 29, 1987, the parties raised the issue with the court of appropriate means to insure that pregnant women do not reside at Catherine Street. There is a particular problem relating to teen-aged females who might wish to conceal their pregnancy from other family members. While the notices are within the administrative purview of the defendants as governmental organizations, these notices must be prominently displayed, in English and in Spanish so they will be calculated to reach the affected groups and must contain language that fully apprises the reader that pregnant women and their unborn children are at risk if they remain at the shelter and they must report to their social worker.

. The shelter is currently operating under a waiver of State regulations limiting duration of stay in Tier I congregate shelters to 21 days (18 NYCRR part 900).

. Under the Social Services Law, the State has a supervisory role rather than a direct role in the provision of assistance to the homeless (Matter of Fulton v Krauskopf, 117 AD2d 198 [1st Dept 1986]; Slade v Koch, 135 Misc 2d 283 [Sup Ct, NY County]).

. The restrictions concerning exclusion of length of stay and the maintenance plan arose from the testimony on behalf of the city that these steps would render the shelter safe for occupancy. It is undisputed that sheetrocking or otherwise permanently sealing and encapsulating surfaces containing lead-based paint would abate the lead hazard. The city retains the option to pursue this method and in such circumstances, the above restrictions would not be applicable.