OPINION OF THE COURT
Edward H. Lehner, J.
The issue posed by the trial of this action is whether the City of New York (the City) is required to provide a person infected with the human immunodeficiency virus (HIV) who has a medical condition that constitutes an "HIV related disease”, as defined by the AIDS Institute of the New York State Department of Health, with the same shelter benefits as a person who has AIDS, as defined by the Federal Centers for Disease Control (CDC).
Prior to the institution of this action the City had adopted a policy of providing individuals diagnosed as having CDC-defined AIDS with individual housing units or granting rent subsidies. Although recently, under State Department of Social Services regulations, all public assistance recipients who have an HIV related disease have been declared eligible for rent subsidies, they are not entitled to other benefits, which include individual housing and a cash allowance for nutrition and transportation expenses, unless their condition constitutes AIDS under the CDC definition.
Pursuant to the CDC a person is considered to have AIDS if he or she has an HIV infection and suffered one of several opportunistic diseases. The State definition of an HIV related disease includes other illnesses not contained on the CDC list. As of January 1, 1993, which was after the trial of this action, the CDC definition was amended to include HIV infected persons who since their infection experienced pulmonary tuberculosis (TB), cancer of the cervix, or two or more episodes of bacterial pneumonia. Also, now included are infected persons who have 200 or fewer CD-4 cells per microliter of blood, which is considered to be approximately one fifth of the normal level. Such cell count determines the extent of the body’s immune defenses. Thus, a person who on December 31, 1992 would not be deemed to have AIDS would, in light of the definitional change, be considered to have the disease on the next day if he or she fell within one of the categories added as of January 1, 1993. Although there have been estimates that the expanded definition would double the number of persons *70 deemed to have AIDS, the City has indicated that it will provide the same services to those who fit the amended definition as it did to those who met the prior guidelines. It is noted that while there appears to be no regulation requiring the City to provide any specific services to AIDS victims (other than the aforesaid rent supplement), lawyers for the City stated at a conference held on February 25, 1993 that the City intended to continue to provide the existing services.
This action was originally instituted by three homeless individuals, who had an HIV related disease but not CDC-defined AIDS, on behalf of themselves and all others similarly situated. As a result of the aforesaid definitional change, it is believed that the number in the plaintiff class has been significantly reduced as the categories added to the CDC definition probably included the largest number of persons having a condition set forth in the State list that was not included in the CDC definition. However, no party could provide an estimate of the number of persons now in the class. Said plaintiffs sought a judgment declaring that the City and State defendants are mandated to provide them "with medically appropriate housing which includes, at a minimum, a private sleeping area and sanitary facilities”. They asserted that placing HIV infected persons, whose immune systems are severely weakened, in a shelter where many residents have infectious diseases endangers the lives of the HIV infected individuals.
Persons who were part of the class when the action was commenced, but who are now classified as having CDC-defined AIDS as a result of the January 1993 amendment have as a consequence thus obtained the relief sought by plaintiffs.
After housing was provided by the City to the original three individual plaintiffs, an application was made by Wayne Phillips (a person allegedly similarly situated) to intervene and for a preliminary injunction to require the City to provide him with medically appropriate housing. The City cross-moved to dismiss pursuant to CPLR 3211 (a) (7).
In my decision (Mixon v Grinker, NYLJ, Jan. 24, 1989, at 22, col 5) the motion to intervene was granted without objection, it having been recognized by all that the issues presented were of significant public importance and unfortunately certain to recur. The request for class certification was denied on the grounds that members of the proposed class would be protected under the principles of stare decisis. In granting Phillips’ motion for a preliminary injunction I stated (at col 6):
*71 "The papers show that Phillips has been diagnosed with symptomatic AIDS Related Complex, an advanced stage of HIV-infection where his immune system is seriously impaired. Although his illness would not be deemed AIDS under the CDC definition, plaintiffs have submitted medical evidence indicating that with regard to need for medically appropriate housing, there is no reason for a distinction between CDC defined AIDS and other HIV related illnesses, and that many persons die of HIV related illnesses without ever meeting the criteria for CDC defined AIDS. * * *
"Since providing Phillips shelter in a barracks type setting may well involve irreparable danger to his health, and since he stands a likelihood of success in establishing that a person in his condition is entitled to be provided with shelter that is more private, the court finds that Phillips has satisfied the prerequisites for the issuance of a preliminary injunction, and thus hereby directs that, pending the trial of this action, he be provided shelter by the City in a facility where he will not be in close proximity to those who may have infectious diseases.
"Whether the minimum housing that the City must provide calls for a private sleeping area as demanded by plaintiffs is an issue that cannot be determined at this time, but must await the trial, as is the question as to how advanced the infection must be to entitle a homeless person to housing in a noncongregate facility.”
The City’s motion to dismiss was denied except to the extent that the Coalition for the Homeless (the Coalition) was dismissed as a party plaintiff for lack of standing. On appeal, that dismissal was reversed (157 AD2d 423, 428), the Court concluding that other than reinstating the Coalition as a plaintiff, "the order should be otherwise affirmed”. Notwithstanding such language, it is noted that since the only branch of the order appealed from related to the aforesaid dismissal, the propriety of the balance of the order was not before that Court. However, the Court in granting standing to the Coalition observed (at 428): "While the municipal defendants have recognized the necessity of providing noncongregate housing for those with CDC-defined AIDS, such facilities have not been made available to those suffering from HIV-related illnesses even though the effects of such illnesses may indeed be devastating and life-threatening. The immune systems of those infected with HIV illnesses are just as susceptible to infectious diseases, such as tuberculosis, which have been found to be pervasive in the city shelter system.”
*72 Subsequently, apparently as a result of the institution of this suit, the City devised and, after the adoption of several changes requested by State officials, the State approved the Comprehensive Care Program (CCP) whereby segregated space in five shelters in the City was to be set aside for persons with HIV related disease and other homeless individuals in a frail condition. The rooms in these shelters would be "dormitory” style, with up to 12 persons in a room. No individual with an HIV related disease would be required to reside in such space, but anyone seeking admission would be required to submit to a skin test and X-ray for TB. Persons shown to have infectious TB would not be admitted to the program, but rather would be referred to a hospital. However, it was established at trial that the skin test and X-ray cannot always determine the existence of active TB in a person with an HIV infection because of the manner in which the body’s immune system is damaged. This is especially so with respect to persons with multiple drug resistant TB, a condition prevalent among many homeless persons who have failed to complete a prior prescribed regimen of drug treatment for TB. Tests to determine whether a person has multiple drug resistant TB can take several months.
Persons admitted to the CCP would still share common eating and communal facilities with other residents of the shelter, but would have enhanced nutrition and special social services. A medical clinic open 7 days a week, 8 hours a day, would be established in each of the CCP shelters, with a physician to be available 20 hours per week. The City points out that by having similarly ill persons together, the residents can be monitored daily to see that prescribed medication is taken, and that this is preferable to placing such homeless persons in apartments or SRO rooms where regular contact with needed medical care is less likely to be maintained.
Although the program is stated to be "temporary”, the City acknowledges that "at the present time it is not practicable to create enough supportive apartment programs and supportive SROs to house and service all such persons in nonshelter based settings, as there is no prospect of enough such housing in the near future for which all or most of the HIV-positive symptomatic clients would be suitable”.
In moving for dismissal the City argues that its determination to provide noneongregate housing to homeless persons with AIDS is a rational means of allocating scarce resources among the many homeless persons seeking public assistance. *73 In support of its legal position that the court should not enjoin the implementation of the CCP, the City maintains that the "opinions of medical professionals entrusted by law with determining medical questions on public safety and the control of infectious disease, if rational, are entitled to prevail over contrary professional opinions on such medical issues”.
The obligation of the City to provide shelter to the homeless emanates from the consent decree dated August 26, 1981 in the case of Callahan v Carey (NY County, index No. 42582/ 79), in which the City agreed to provide emergency shelter to homeless men. In Eldredge v Koch (98 AD2d 675, 676 [1st Dept 1983]), the obligation was extended to women, the Court ruling that "homeless women are constitutionally entitled to treatment equal to that accorded to homeless men”, and finally in McCain v Koch (70 NY2d 109, 113-114, 118 [1987]), the right to emergency housing for families was recognized, as was the duty of a court to see that when government provides housing that it satisfy "minimum standards of sanitation, safety and decency”, and be "minimally habitable”. In Barnes v Koch (136 Misc 2d 96, 101 [Sup Ct, NY County 1987]), it was stated that entitlement to shelter "necessarily includes the right to be sheltered free of potentially significant health threats”. Thus, it can be seen that the current provisions for housing the homeless resulted not from initiatives of the Executive or Legislature, but rather are the results of litigation.
It is true, as argued by the City, that when a regulation is adopted by physicians responsible for public health, the regulation must, unless irrational, be upheld by the courts which should not determine which of conflicting medical opinions is correct. Thus, following this principle, in Chiropractic Assoc. v Hilleboe (12 NY2d 109 [1962]) a challenge to a Health Department regulation limiting the persons who may apply radiation to a human was rejected; in Grossman v Baumgartner (17 NY2d 345 [1966]), a regulation prohibiting tattooing by nonlicensed medical personnel was upheld; and in Matter of New York State Socy. of Surgeons v Axelrod (77 NY2d 677 [1991]), the decision of the State Health Commissioner to not include HIV infection on the lists of communicable and sexually transmitted diseases was found to have a rational basis.
But what the court is dealing with here is the adoption by the City Department of Human Resources, acting with the assistance and advice of medical personnel, of a compromise practical solution to a complex societal problem. There is no *74 doubt that a resolution providing each person suffering from an HIV related disease with an individual room would be a preferable medical solution, although City physicians would urge that said rooms be in a single building or complex so that the medical staff could insure that the residents follow the prescribed regimen of drugs. However, as noted above, the City contends that such program is not feasible at this time due to the lack of sufficient housing.
Although such a program of individual housing would be the most desirable and create the least risk to HIV infected persons of coming in contact with others with infectious diseases, government cannot be required to provide an optimal solution. A rational result, considering all of the circumstances, is what is required. I find after this lengthy trial, at which conflicting medical opinions were offered together with voluminous exhibits, that a program that can place as many as 12 persons with weakened immune systems in a single room lacks a rational basis. As indicated above, admission tests to the program cannot reliably determine promptly whether a person is suffering from multiple drug resistant TB, which disease has reached near epidemic proportions among the homeless who are HIV infected. Thus, a person may be in the program for months spreading the disease before the infectious nature of the illness is medically determined. This is also true of other infectious diseases.
In Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo (64 NY2d 233, 239-240 [1984]), the Court stated: "While it is within the power of the judiciary to declare the vested rights of a specifically protected class of individuals, in a fashion recognized by statute * * * the manner by which the State addresses complex societal and governmental issues is a subject left to the discretion of the political branches of government * * * Where, as here, policy matters have demonstrably and textually been committed to a coordinate, political branch of government, any consideration of such matters by a branch or body other than that in which the power expressly is reposed would, absent extraordinary or emergency circumstances * * * constitute an ultra vires act” (emphasis supplied). In Love v Koch (161 AD2d 209, 211 [1st Dept 1990]), where the plaintiffs were mentally ill homeless persons not in need of hospitalization, but who were seeking residential care from the City, the Court, in affirming my order denying a dismissal of the complaint, quoted the above *75 but concluded that the "matter may very well constitute such 'extraordinary or emergency circumstances’
I find based on the testimony at trial that there are indeed "emergency circumstances” presented by the unfortunate fate of the plaintiffs who have no home and face an uncertain future as a result of being infected with an illness that regrettably still is not fully understood. Accordingly, although I can find no basis to direct that the plaintiff class be provided the same shelter and other benefits the City provides CDC-defined AIDS patients, I conclude that under the circumstances it would be irrational to place more than four persons of the plaintiff class in one room, whether it be in the CCP or other facility. Further, beds in the room should never be less than eight feet apart. Crucial to the appropriateness of such living arrangements is that the ventilation be adequate for the medical needs of the residents. Since I am unable to state any rules for determining such adequacy, the judgment to be settled hereon should order that the housing to be provided to plaintiffs contain adequate ventilation, with the adequacy to be certified by the City Commissioner of Health, employing recognized standards appropriate to the illness of the residents. Finally, arrangements should be made for persons in the program to have the option to eat and have bathroom facilities separate from the general population of the facility.
Declarations and relief sought in the complaint not herein granted are denied and the claims dismissed.