[627 NYS2d 668]

KENNETH MIXON et al., on Behalf of Themselves and All Others Similarly Situated, et al., Appellants-Respondents, and WAYNE PHILLIPS et al., on Behalf of Themselves and All Others Similarly Situated, Intervenors-Appellants-Respondents, v WILLIAM GRINKER, as Commissioner of the New York City Human Resources Administration, Respondent-Appellant, and CESAR PERALES, as Commissioner of the New York State Department of Social Services, Respondent.

First Department, June 8, 1995

**APPEARANCES OF COUNSEL**

*Lawrence C. Fox* of counsel *(Virginia Schubert* on the brief; *Kornstein Veisz & Wexler,* attorneys), for appellants-respondents and intervenors-appellants-respondents.

*Timothy J. O'Shaughnessy* of counsel *(Kristin M. Helmers* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for respondent-appellant.

*Judith T. Kramer* of counsel *(Dennis C. Vacco, Attorney-General,* attorney), for respondent.

**OPINION OF THE COURT**

Per Curiam.

Plaintiffs commenced this action in 1988 to address the shelter needs of homeless persons who are seropositive for the human immunodeficiency virus (HIV-positive) and who also have a medical condition that constitutes an "HIV related disease" as defined by the AIDS Institute of the New York State Department of Health.[1] Through this litigation, plaintiffs, who are "HIV-ill" but do not have AIDS as defined by the Federal Center for Disease Control (CDC), sought a judgment declaring, *inter alia,* that they are entitled to the same shelter benefits from the City and State of New York as are provided to homeless persons who have been diagnosed with

---

1. The AIDS Institute definition of HIV related disease was developed to identify cases of serious HIV related illness which were not covered by the Federal Center for Disease Control's narrower definition of AIDS.

CDC-defined AIDS.[2] In practical terms, plaintiffs sought a judgment requiring the City to provide them with housing outside the municipal shelter system.

By decision and order dated January 11, 1989, the Supreme Court denied plaintiffs' motion for class certification, denied defendants' motion to dismiss the complaint on the grounds that the issues raised were not justiciable, and granted the City's motion to dismiss the Coalition for the Homeless as a party. On appeal to this Court, the sole issue raised was the propriety of the motion court's dismissal of the Coalition for the Homeless from the action. We reversed and reinstated the Coalition for the Homeless as a plaintiff (*Mixon v Grinker*, 157 AD2d 423).

Then, in May 1989, the City announced a plan for increased services for indigent HIV-ill individuals and persons with AIDS, including noncongregate housing in special, separate units within the shelters. As envisioned by the City, these special units would also provide for improved nutrition, a part-time physician, a nurse to dispense medication, intensified staffing to maintain cleanliness, additional case management services, medical care and transportation to medical appointments and access to substance abuse services. Furthermore, HIV-positive people in the special units who demonstrated problems with daily living were to be referred for nonshelter housing or other medically appropriate placement. The City's new program was not immediately implemented due to concerns raised by the State Department of Social Services (DSS), which is responsible for the certification, oversight and regulation of all adult shelters within New York (*see,* 18 NYCRR part 485 *et seq*).

In November 1989, the City and State reached agreement on a similar plan, the Special Needs Program, pursuant to which special areas would be created that were generally similar to those contemplated in the City's proposal. The Special Needs Program provided that individuals with serious

---

2. On January 1, 1993, the CDC definition of AIDS was expanded to include, *inter alia,* as AIDS-defining illnesses, pulmonary tuberculosis, certain cancers of the cervix, repeated bacterial pneumonia and a lymphocyte (CD-4) cell count of 200 or less. Thus, after the trial of this action many members of the plaintiff class were, by virtue of the CDC's redefinition of AIDS, shifted into the category of persons with AIDS. Those with HIV related disease still includes people with serious dermatological conditions, major bacterial infections, severe blood and neurological disorders and severe constitutional symptoms.

and easily communicable infectious conditions, such as chronic diarrhea or infectious tuberculosis, would be excluded from the Special Needs areas in the shelters. However, the start of the Special Needs Program was also delayed, this time to allow a new administration to take control of the municipal government.

On February 20, 1990, then Mayor David Dinkins announced that the City would proceed with one Special Needs Unit at the Bellevue shelter. Six months later, on August 3, 1990, Mayor Dinkins and his Commissioners of the Human Resources Administration and the City Department of Health, along with the President of the New York City Health and Hospitals Corporation, released a comprehensive plan, entitled "Continuum of Housing and Services for the Medically Frail and HIV-Ill". It is this plan and its provisions for the plaintiff class which were ultimately the focus of this trial.

This plan identified three categories of indigent HIV-positive individuals: those who are asymptomatic; those who are HIV-ill and capable of the Activities of Daily Living (ADL [i.e., eating, using the toilet, taking medication, bathing, dressing and grooming]); and those who have AIDS or who are HIV-ill and require assistance with the ADLs. In the August 1990 Continuum, people in the first group, HIV-positive and asymptomatic, are to be given beds in the shelter system and encouraged to accept available medical and other services so that their medical condition can be closely monitored and, insofar as possible, treated. As for persons who fall within the second category, the plaintiff class, the plan calls for them to be offered rental assistance of up to $480 per month, with an increased rental allowance for additional family members (18 NYCRR 397.11).

Under the August 1990 plan, HIV-ill and other medically frail people who cannot find permanent housing, or who are unable to live alone, are eligible for the Comprehensive Care Program (CCP), similar to the Special Needs Program. The CCP would use segregrated spaces in five municipal shelters, housing up to 12 people in a dormitory-style room. Those housed in the CCP space would still share common eating and bathroom facilities with other shelter residents, but would be afforded enhanced nutrition and special social services. The plan calls for each CCP to have on-site medical coverage eight hours a day, seven days per week, through a combination of physicians (20 hours per week), registered nurses, nurse practitioners, and physician's assistants.

However, the CCP is not designed to house persons with untreated pulmonary tuberculosis, asymptomatic enteric disease or other infectious conditions. The New York City Department of Health's Tuberculosis Control Program is to be assigned the responsibility of training shelter staff where a CCP is located on tuberculosis issues and to monitor the facility. In its decision after trial dated March 4, 1993, Supreme Court described the CCP's provisions for tuberculosis screening as follows: "No individual with an HIV related disease would be required to reside in such space, but anyone seeking admission would be required to submit to a skin test and X-ray for TB. Persons shown to have infectious TB would not be admitted to the program, but rather would be referred to a hospital. However, it was established at trial that the skin test and X-ray cannot always determine the existence of active TB in a person with an HIV infection because of the manner in which the body's immune system is damaged. This is especially so with respect to persons with multiple drug resistant TB, a condition prevalent among many homeless persons who have failed to complete a prior prescribed regimen of drug treatment for TB. Tests to determine whether a person has multiple drug resistant TB can take several months." (Mixon v Grinker, 157 Misc 2d 68, 72.)

This failure of the CCP to adequately address the spread of tuberculosis is a key element of plaintiffs' attack on the plan as insufficient to meet the City's shelter obligations for the HIV-ill. Indeed, the thrust of plaintiffs' argument, both below and on appeal, is that any plan which relies on congregate shelter housing, whether it be in large armory-style shelters, rooms of 12 as originally provided for in the CCP, or rooms of four with beds eight feet apart as required by the Supreme Court's judgment, presents an extreme health danger to a person who is HIV-ill such that the plan cannot be held to satisfy "minimum standards of sanitation, safety and decency" which are necessary for housing to be "minimally habitable" (McCain v Koch, 70 NY2d 109, 113-114, 118).

Finally, the plan calls for the third group of individuals, persons with AIDS and the HIV-ill who cannot perform the ADLs, to be supplied with case management services by the Division of AIDS Services (DAS), formerly known as the Central Management Unit, of defendant New York City Human Resources Administration (HRA). DAS offers a variety of mandated medical, transportation, housing and social services. Persons in this last group are provided nonshelter housing

through rent assistance, apartments in public housing, private sector apartments, scatter-site apartments operated by non-profit organizations, commercial single room occupancy (SRO) hotels, supported SROs operated by nonprofit organizations, supported housing, and health care facilities.

A nonjury trial was held in January 1991 at which there was extensive testimony by medical and housing experts. The trial was reopened in February 1992 for further testimony regarding the impact of a City-wide outbreak of tuberculosis. After rendering its decision, Supreme Court entered a judgment, the decretal portion of which provides,

"NOW, IT IS ADJUDGED that the plaintiffs are not entitled to the same shelter and other benefits the City provides to persons who have AIDS as defined by the CDC; however, it is further

"ADJUDGED that the City may not place more than four persons in any room in which persons with HIV Related Disease are living; that the beds in each room where persons with an HIV Related Disease are living should never be less than eight feet apart; that the ventilation in each such room be adequate for the medical needs of its residents with the adequacy to be certified by the City Commissioner of Health, employing recognized standards appropriate to the illness of its residents; that persons with HIV Related Disease who are housed in the CCP should have the option to eat and to have bathroom facilities separate from the general population of the facility.

"ADJUDGED that the declarations and relief sought by the plaintiffs in their complaint are in all other respects denied and that the claims are dismissed."

Plaintiffs appeal, arguing that Supreme Court erred in declaring that they were not constitutionally and statutorily entitled to the same shelter and other benefits as persons with CDC-defined AIDS. They also contend that the trial court's ruling is contrary to the evidence and impermissibly took into account the excuse of inadequate resources. The City cross-appeals, arguing that Supreme Court erred by modifying its plan with respect to the placement in CCPs of those homeless persons who are HIV-ill, but who can carry out the ADLs. In so doing, the City claims, the trial court improperly substituted its judgment for those officials of the executive branch of government who are statutorily obligated to formulate a response to the social dilemma presented by the simultane-

ously occurring crises of homelessness, AIDS and tuberculosis. Both sides agree that the directives contained in the penultimate paragraph of the judgment constitute a compromise solution fashioned by the Supreme Court without factual support in the record.

Upon a review of the relevant law, we agree with the Supreme Court's denial of a judgment declaring that plaintiffs are entitled to the same housing benefits as persons with CDC-defined AIDS as a matter of constitutional or statutory law per se. When the government, however, undertakes to provide emergency housing for the homeless, it must do so in a way "which satisfies minimum standards of sanitation, safety and decency" *(McCain v Koch, supra,* at 113-114). Upon a careful review of the extensive record developed at trial, we cannot agree that the City's plan, even with the trial court's attempted improvements, provides for "the minimum level of habitability which defendants now must meet" in such circumstances *(supra,* at 120) and therefore modify the judgment accordingly and remand for further proceedings.

When this matter was last before this Court on appeal of Supreme Court's decision on the motion to dismiss, we observed, "It has been estimated that there are from 60,000 to 80,000 homeless people living in New York City, 25,000 of whom are housed in the city's shelters on any given night. While 14,000 individuals have been diagnosed as having AIDS in New York, as many as 400,000 people in the city may be infected with the HIV virus according to government statistics. While the municipal defendants have recognized the necessity of providing noncongregate housing for those with CDC-defined AIDS, such facilities have not been made available to those suffering from HIV-related illnesses even though the effects of such illnesses may indeed be devastating and life-threatening. The immune systems of those infected with HIV illnesses are just as susceptible to infectious diseases, such as tuberculosis, which have been found to be pervasive in the city shelter system." *(Mixon v Grinker,* 157 AD2d 423, 427-428, *supra.)* While it appears that the reported number of new tuberculosis cases is on the decline,[3] it does not appear that the dire situation depicted in this Court's prior decision has been ameliorated. Advocates for people living with AIDS estimate that as many as 60% of the people they serve will

---

3. Jones, *Tuberculosis Cases Decline 2d Year in a Row, City Says,* New York Times, Mar. 14, 1995, at B1, col 2.

need some form of housing assistance during their lifetimes.[4] As of July 31, 1994 nearly 80,000 cases of AIDS were reported in New York State, of which, in excess of 60,000 are in New York City.[5] New York State leads the nation in AIDS cases among women and it is predicted that by the year 2000, over 30,000 of New York State's children and adolescents will have been orphaned by the HIV/AIDS epidemic.[6] In sum, AIDS, homelessness and tuberculosis are no less of a vexing public health crisis with vast implications for our society than when this matter was last before us five years ago.

In urging this Court to modify the judgment to the extent of deleting the penultimate paragraph and to approve the CCP as originally proposed, the defendants argue that it is of "paramount concern * * * that the judiciary not undertake tasks that the other branches [of government] are better suited to perform" (Klostermann v Cuomo, 61 NY2d 525, 535). The City maintains that its determination to provide non-congregate housing to homeless persons with CDC-defined AIDS, but not to provide the same to those who are merely HIV-ill, is an allocation of limited resources which the Supreme Court should not have disturbed because defendants put forth expert testimony at trial which established that the City's plan has a rational basis. In its decision after trial, Supreme Court summarized the City's position as follows: "[T]he City argues that its determination to provide non-congregate housing to homeless persons with AIDS is a rational means of allocating scarce resources among the many homeless persons seeking public assistance. In support of its legal position that the court should not enjoin the implementation of the CCP, the City maintains that the 'opinions of medical professionals entrusted by law with determining medical questions on public safety and the control of infectious disease, if rational, are entitled to prevail over contrary professional opinions on such medical issues' " (Mixon v Grinker, 157 Misc 2d, supra, at 72-73). Defendants' argument, reduced to its most basic premise, would confine the court's role to merely determining whether defendants have proffered any evidence in support of their position, without conducting

4. An Overview of AIDS Housing in New York State, 4 New York AIDS Coalition News [NYAC News] 1 (Winter 1995).

5. Recommendations for Minimum AIDS and TB-Related Funding Increases for Community-Based Services in Fiscal Year 1995-96, 4 NYAC News 1, 14 (Winter 1995).

6. Ibid.

a true evaluation of its merit. Of course, such a limited view of judicial authority renders any potential review meaningless, because, as was the case here, those who develop the policy can be expected to offer testimony in its support.

While we are cognizant of our role in a tripartite system of government, we decline to adopt the defendants' narrow view which would, in essence, convert the courts into a rubber stamp for any policy developed by municipal and State agencies. If, as here, contradictory evidence has been proffered at a nonjury trial, the court not only has the power, but, in fact, has an affirmative duty to weigh, assess, and evaluate such evidence. In doing so, the court may consider those factors ordinarily considered by a finder of fact in assessing credibility and it need not turn a blind and uncritical eye to the testimony of witnesses who, as authors and proponents of a given policy, have a vested interest in its being upheld. Indeed, when, as here, there is compelling evidence which undermines the purported rationale of an agency's decision or proposal, a court should not fail to act simply out of deference to an agency's proposal, particularly when such a failure would endanger the health and safety of individuals who are among the most vulnerable and least able to obtain redress through the other branches of government.

As was succinctly summarized by the trial court, the judiciary has consistently acted to guarantee minimum health and safety standards for emergency housing: "The obligation of the City to provide shelter to the homeless emanates from the consent decree dated August 26, 1981 in the case of *Callahan v Carey* (NY County, index No. 42582/79), in which the City agreed to provide emergency shelter to homeless men. In *Eldredge v Koch* (98 AD2d 675, 676 [1st Dept 1983]), the obligation was extended to women, the Court ruling that 'homeless women are constitutionally entitled to treatment equal to that accorded to homeless men', and finally in *McCain v Koch* (70 NY2d 109, 113-114, 118 [1987]), the right to emergency housing for families was recognized, as was the duty of a court to see that when government provides housing that it satisfy 'minimum standards of sanitation, safety and decency', and be 'minimally habitable'. In *Barnes v Koch* (136 Misc 2d 96, 101 [Sup Ct, NY County 1987]), it was stated that entitlement to shelter 'necessarily includes the right to be sheltered free of potentially significant health threats'. Thus, it can be seen that the current provisions for housing the homeless resulted not from initiatives of the Executive or

Legislature, but rather are the results of litigation." *(Mixon v Grinker,* 157 Misc 2d, *supra,* at 73.)

In *McCain v Koch* (70 NY2d 109, *supra),* the Court of Appeals held that where the City has embarked upon furnishing emergency accommodations for homeless families with children, the judiciary has the equitable power to issue a preliminary injunction to ensure that the housing satisfies minimum standards of sanitation, safety and decency *(see also, McCain v Dinkins,* 84 NY2d 216 [the City and some of its officials held in contempt for failing to comply with court orders precluding the housing of homeless families at welfare office emergency assistance units]). The Court of Appeals did not, it should be noted, reach the question of whether homeless families with children had a constitutional or statutory right to emergency housing, observing that the City, by adopting departmental regulations (18 NYCRR 352.3 [g], [h]), had undertaken to do so and was, consequently, required to meet certain minimum quality standards. Similarly, in *Doe v Dinkins* (192 AD2d 270), this Court concluded that the trial court had not abused its discretion in granting plaintiffs' motion for a preliminary injunction directing the municipal defendants to reduce the population at two homeless shelters to 200 beds each where the capacity at these shelters exceeded the bed limit required pursuant to 18 NYCRR 491.3 (g) (1) (i) and 491.10 (o) (9) (iv).

Thus, in this case, it was within the province of the trial court to assess the testimony of the various witnesses at trial and to find, as it stated in its decision, that "after this lengthy trial, at which conflicting medical opinions were offered together with voluminous exhibits, that a program that can place as many as 12 persons with weakened immune systems in a single room lacks a rational basis" *(Mixon v Grinker,* 157 Misc 2d, *supra,* at 74). The record supports the trial court's finding that the CCP's "admission tests" designed to screen for tuberculosis, described above, "cannot reliably determine promptly whether a person is suffering from multiple drug resistant TB, which disease has reached near epidemic proportions among the homeless who are HIV infected" *(supra,* at 74). Moreover, we find that the record, which consists of 10 bound volumes on appeal, supports a conclusion that the CCP, as currently envisioned by the defendants, does not meet "minimum standards of sanitation, safety and decency" *(McCain v Koch,* 70 NY2d, *supra,* at 113-114) for housing the plaintiff class as it fails to sufficiently protect them against the

dangers of tuberculosis. However, as all parties agree that the record, as it now reads, does not support a finding "that the requirements imposed by the [trial] court will actually" improve upon the plan developed by the City, we vacate the penultimate paragraph of the judgment and remand to the trial court to enter a judgment which provides that the emergency housing offered to members of the plaintiff class be "minimally habitable." (Supra, at 118.) In fashioning such judgment, the trial court may, in its discretion, conduct a hearing, either upon the request of a party or sua sponte, as to what modifications must be made to the City's plan to have it meet the requirement of being "minimally habitable."

We note, however, that a plan for the plaintiff class must present more than an illusion of protecting the HIV-ill from exposure to tuberculosis. While we affirm the trial court's holding that there is no constitutional or statutory requirement per se that members of the plaintiff class be provided exactly the same housing benefits as those with CDC-defined AIDS, it may well be that, as a practical matter, after further consideration, that the Supreme Court will determine that the only manner in which individuals in the plaintiff class can be provided "minimally habitable" emergency housing is by making available to them one or some combination of the many alternatives which are now offered to persons with CDC-defined AIDS. Finally, to the extent that the municipal defendants may argue on remand, as they have throughout this litigation, that any plan other than the CCP which they originally proposed will be financially burdensome or inconvenient, we repeat our observation, made in a different context, that "[a]ny inconvenience caused by compliance is outweighed by the harm which would be suffered otherwise" (Doe v Dinkins, supra, at 276).

Accordingly, the judgment of the Supreme Court, New York County (Edward H. Lehner, J.), entered on July 29, 1993 after a nonjury trial, should be modified, on the law and the facts, without costs, to the extent of vacating the directives contained in the penultimate paragraph of the judgment and the matter remanded for further proceedings in accordance with this opinion.

KUPFERMAN, J. (dissenting). I would modify and reinstate the City's plan.

Initially I was prepared to affirm because I believed that the Supreme Court modification called in the Per Curiam "a

compromise solution" was a more sensible approach than that of the City.

However, on consideration of this Court's proposed new direction for remand, I came to the conclusion that the position so constructively presented in the City Journal, entitled *"Government by Decree", The High Cost of Letting Judges Make Policy,* by Ross Sandler and David Schoenbrod (vol 4, No. 3, at 54 [Summer 1994; Manhattan Institute]), indicated the proper course.

The Court should not be tinkering with a plan proposed by those charged with finding a solution to the problem. There is no gainsaying that AIDS in its various forms is a plague and that resources must be allocated to find a preventive and a cure and to assist those affected. But, cancer is also a plague and there are enough health problems to designate one for every week of the year and, as more develop, it may be possible to have one a day.

The latest, of course, are Group A streptococcus, now popularly known as the "flesh-eating disease" *(see,* Rosenthal, *Flesh-Eating Illness Confirmed as Cause of Death,* New York Times, Apr. 11, 1995, at B2, col 4) and the Ebola virus *(see,* Altman, *The Deadly Virus in Zaire: Sifting the Many Mysteries,* New York Times, May 13, 1995, at 1, col 3).

When health officials promulgate rules and procedures for dealing with such an outbreak and the problems caused therefrom, will the courts attempt to micromanage the system? Will Judges turn their black robes in for white medical gowns?

As the Court of Appeals stated in *Matter of New York State Socy. of Surgeons v Axelrod* (77 NY2d 677, 685): "We cannot substitute our judgment for that of qualified experts in the field of public health unless their judgment is 'without justification.' "

We can hardly say that the plan here is without justification.

SULLIVAN, J. P., ELLERIN, WALLACH and MAZZARELLI, JJ., concur in a Per Curiam opinion; KUPFERMAN, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County (Edward H. Lehner, J.), entered July 29, 1993, modified, on the law and

the facts, without costs, to the extent of vacating the directives contained in the penultimate paragraph of the judgment and the matter remanded for further proceedings in accordance with this Court's opinion.