OPINION OF THE COURT
 

 Bellacosa, J.
 

 As if the seeming insolubility of society’s efforts to house the homeless were not a daunting enough problem, a collateral consequence takes center judicial stage arising out of a series of long-standing lawsuits culminating in contempt adjudications against the City of New York and four City officials.
 

 The City and the four appointed City officers are held in contempt of judicial orders for disobeying mandates in the underlying cases. Appellants include the City of New York; the New York City Human Resources Administration (HRA); former First Deputy Mayor Norman Steisel; former Human Resources Administration Commissioner Barbara J. Sabol; former HRA Executive Deputy Commissioner Jeffrey Carples, who is currently Acting Commissioner of the New York City Department of Homeless Services (DHS); and former HRA Deputy Commissioner Kenneth Murphy, who is currently Deputy Commissioner of DHS.
 

 
 *221
 
 By leave of the Appellate Division on the municipality’s and the officials’ main appeal, this Court affirms the portion of the Appellate Division order upholding Supreme Court’s findings of civil contempt, including the monetary fines payable by the City. The cross appeal by Legal Aid on behalf of the aggrieved homeless persons should also result in an affirmance. We find justified the modification by the Appellate Division striking, as unwarranted here, the sanction that would have incarcerated the four City officials in Emergency Assistance Units (EAUs). However, while the actions of the City’s four agents warrant affirmance of their adjudication of contempt, the Appellate Division’s remittal for imposing a new sanction as to them serves no remedial purpose in this case where those agents no longer hold office or pertinent offices. Therefore, to that extent only, we modify to strike the remittal. With this denouement of the collateral contempt features of the underlying lawsuits virtually ended, the parties and newly responsible public officials should return their full attention and humane efforts to solving or ameliorating the core, substantive problem itself.
 

 L
 

 The Appellate Division order acted on two orders of Supreme Court: (1) dated November 13, 1992, which adjudged New York City in civil contempt of judicial orders in specified cases; and (2) dated December 8, 1992 (a) directing New York City to pay fines to homeless families who stayed overnight in City EAU offices before being appropriately sheltered; (b) finding four City officials in contempt; and (c) directing the officials to stay overnight in EAUs.
 

 The contempt adjudications stem from a trilogy of court orders in consolidated matters. The litigations, started in the early 1980’s, were brought on behalf of homeless persons in order to induce the City to comply with thé New York State Department of Social Services Administrative Directive, 83 ADM-47 of September 1983 (Directive), which states:
 

 "Local districts must have procedures in place to ensure that homeless persons or persons in imminent danger of becoming homeless can apply for emergency housing whenever such emergency housing is needed * * *
 

 "Emergency housing must * * * be provided immediately if a homeless person is determined eligible * * *
 

 
 *222
 
 "When the individual is determined to be in immediate need and is not determined to be ineligible, an emergency placement shall be made and other needs met.” (83 ADM-47 [IV] [A] [1] [a], [b]; [2] [b].)
 

 The Directive established baseline standards of shelter, sanitation and safety by prohibiting the City of New York from holding families with children overnight in welfare offices while awaiting appropriate accommodations. The Directive was incorporated into court decrees after findings of violations by the City of the Directive
 
 (McCain v Koch,
 
 117 AD2d 198,
 
 revd in part 70
 
 NY2d 109 [1987],
 
 on remand
 
 136 AD2d 473;
 
 Matter of Lamboy v Gross,
 
 126 AD2d 265,
 
 affg
 
 129 Misc 2d 564;
 
 Slade v Koch,
 
 135 Misc 2d 283,
 
 mod
 
 136 Misc 2d 119).
 

 Broadly summarized, the
 
 McCain
 
 order directs the municipality to "[p]rovide lawful emergency housing to all eligible homeless families with children, such emergency housing not to include overnight accommodations at Emergency Assistance Units or Income Maintenance Centers”; the
 
 Lamboy
 
 order prohibited the same City practice of holding families overnight in welfare offices because it violates the 1983 Administrative Directive, which requires that emergency housing "be provided immediately” to eligible homeless families; and the
 
 Slade
 
 order relates to baseline standards for sheltering pregnant women and infants. The three court orders establish compliance goals.
 

 The voluminous record before us documents that the City and the four cited officials repeatedly failed to measure up to the essential compliance goals of these court orders, with "promises by City defendants to take specific actions to remedy [these] violations hav[ing] repeatedly been broken” (Sup Ct, NY County, Nov. 20, 1992, Freedman, J., index No. 41023/ 83). These officials tolerated homeless families with children being held overnight in welfare offices. Appellants do not deny that they failed to provide sufficient permanent housing and to fund all the homeless prevention initiatives they committed themselves to before Supreme Court in the November 1990 plan. Instead, they tender legally inexcusable reasons.
 

 Homeless persons begin their quest for emergency shelter by entering an EAU. In theory, they enter an EAU office, fill out forms and, if determined eligible, are immediately placed
 
 *223
 
 in emergency housing
 
 (see,
 
 83 ADM-47;
 
 Matter of Lamboy v Gross,
 
 126 AD2d, at 267,
 
 supra).
 
 In practice, the municipality, which is unable to predict or prepare the EAUs for fluctuating demands, has left families with children in the EAUs overnight and in documented instances for several days. EAUs are offices with desks, chairs and tables, and are not designed or suitable to serve as any kind of dwelling space. The consequences of the City’s practices include families sleeping on the chairs and on the floor, washing in the sinks of public restrooms, and suffering self-evidently unsanitary and unsafe traumas.
 

 Appellants also do not dispute that homeless citizens were left to spend nights and days in the EAUs. They plead for the Court’s understanding of the seemingly insurmountable shortage of housing to meet the problem, the crisis and the emergencies. They note that the supply and the uncontrollable influx of families and the unmatched demand are the dominating societal forces driving the homeless problem and evading plenary solution. They argue that they acted in good faith and to the best of a municipal ability to fulfill the court orders. In support of this claim, appellants recite increased demand and a series of failed strategies. In effect, they throw up their hands and say they did all they humanly or officially could do.
 

 In the early 1980’s, HRA found hotel rooms for approximately 800 homeless families. Most stayed just one or two months before moving into permanent housing. By 1983, when the
 
 McCain
 
 action began, there were 2,500 homeless families in hotels and shelters in New York City
 
 (see,
 
 HRA, Progress Report on the Five Year Plan for Housing and Assisting Homeless Families [Feb. 1989]). The number of families seeking emergency housing continued to rise as the 1980’s "progressed” and families began staying in shelter systems for longer periods. Five years after
 
 McCain
 
 was instituted, the number of families in emergency housing had burst to over 5,000. The increasing demand was met by the City drafting more and more hotels into its "system”. The use of hotels educed sharp criticism, especially for its effects on young mothers, single-parent families, and the children growing up in such settings and conditions.
 

 In the late 1980’s, the City acquiesced in fundamental changes in the family shelter system. The City Council enacted Local Law No. 19 in 1988 to require the City to elimi
 
 *224
 
 nate the use of welfare hotels by April 1993. In the spring and summer of 1990, the City put almost every low-cost apartment into the program for homeless families and dropped the requirements that families in emergency housing wait first in hotel units before being assigned to apartments. This accelerated placement of homeless families into permanent housing produced dramatic results. By August 1990, the 3,600 families in over 60 hotels in 1987 dropped to only 147 families in three hotels in the entire emergency housing system.
 

 As the elimination of the use of hotels came within grasp, demands for emergency housing surged. Hundreds more families per month rushed to HRA for shelter. HRA had anticipated and planned for 2,732 families for June 30, 1990. The actual number needed turned out to be 3,196 and that number jumped to 4,120 by June of 1991.
 

 Appellants emphasize a particular aspect of their quandary. Instead of the number of homeless families being reduced by accelerating their movement into permanent apartments, the numbers dramatically increased. According to the Mayor’s Commission on the Homeless, "[p]lacing thousands of homeless families, many of whom had only recently entered into the shelter system, into permanent housing appears to have contributed to an enormous surge of families entering the system in the latter part of 1990” (Report of NY City Commn on Homeless, at 73 [Feb. 1992]). The municipality and its cited officials claim that families began to see the shelter system as their best chance to acquire adequate dwellings and they, in turn, applied for emergency housing in greater numbers as word spread of the successful program — up to a point. Thus, the City fostered a greater demand and, ironically, a continuation or exacerbation of the crisis. By the end of the summer of 1990, the Department of Housing Preservation and Development ran out of apartments available for HRA to use. The supply of permanent housing apparently was exhausted from that source. The City seemed forced to return to the use of hotels or to keep the clients waiting in EAUs until there is an adequate opening. Neither constitutes an acceptable solution and certainly not compliance with the Directive or the extant "negotiated” judicial decrees. On the very morning of the issuance of contempt citations by Supreme Court Justice Freedman, the plaintiffs demonstrated ongoing violations with overnight stays of families at the EAUs.
 

 
 *225
 
 II.
 

 A.
 

 The contempt phase of this litigation saga was renewed in earnest in November 1992. Plaintiffs complained that the City and the four officials failed to live up to the letter and promise of the
 
 Slade, McCain
 
 and
 
 Lamboy
 
 orders. The previous contempt proceedings in 1990, after extensive discussions, led to a negotiated resolution with plaintiffs foregoing relief in return for the official commitment to implement a specific remedial plan. The first exertion in June of 1990 required the City to maintain a supply of lawful emergency and permanent housing units sufficient to meet the needs of all homeless families for emergency housing, and to compensate for shortfalls in the number of emergency housing units by substituting permanent housing. Because implementation came to naught, contempt proceedings were revived and Supreme Court directed the City to submit a new remedial plan. A November 1990 mandated plan emerged and constitutes the template against which the contempt violations at issue here were adjudicated. By November of 1992, Justice Freedman found detailed and repeated violations of the 1990 plan.
 

 Matter of McCormick v Axelrod
 
 (59 NY2d 574, 583) and
 
 Heard v Cuomo
 
 (80 NY2d 684) were invoked to frame the issue whether lawful orders were knowingly disobeyed. Both Courts concluded that they had been and imposed contempt findings because "[t]he overnight housing of homeless families at EAUs is intolerable and clearly violates the prior orders of the IAS and this Court in
 
 McCain v Koch
 
 * * * and
 
 Matter of Lamboy v Gross”
 
 (192 AD2d 217, 218). The notion of substantial compliance was rejected as "it is no defense that the municipal defendants were attempting to comply or acting in good faith”
 
 (id.,
 
 at 219, citing
 
 Matter of Bonnie H. [Rose H.]
 
 145 AD2d 830,
 
 lv dismissed
 
 74 NY2d 650). Found equally unavailing was the City’s plight that total compliance in every instance was impossible.
 

 Plaintiffs have sustained their burden for the courts to hold the City of New York and its four cited, appointed officials in contempt pursuant to section 753 (A) (3) of the Judiciary Law. It provides in relevant part:
 

 "A court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or
 
 *226
 
 remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced, in any of the following cases * * *
 

 "3. A party to the action or special proceeding * * * for any other disobedience to a lawful mandate of the court.”
 

 Civil contempt has as its aim the vindication of a private party to litigation and any sanction imposed upon the contemnor is designed to compensate the injured private party for the loss of or interference with the benefits of the mandate
 
 (Matter of McCormick v Axelrod,
 
 59 NY2d 574, 583,
 
 supra; State of New York v Unique Ideas,
 
 44 NY2d 345).
 

 Although the line between the civil and criminal contempt may be difficult to draw in a given case and the same act may be punishable as both a civil and a criminal contempt, the element which escalates a contempt to criminal status is the level of willfulness associated with the conduct
 
 (Matter of McCormick v Axelrod,
 
 59 NY2d 574, 583,
 
 supra).
 
 In the matters at issue, criminal contempt was not sought and is not in issue
 
 (see, People ex rel. Stearns v Marr,
 
 181 NY 463, 471).
 

 To sustain a civil contempt, a lawful judicial order expressing an unequivocal mandate must have been in effect and disobeyed
 
 (see, e.g., Pereira v Pereira,
 
 35 NY2d 301, 308;
 
 Matter of Spector v Allen,
 
 281 NY 251, 259;
 
 Ketchum v Edwards,
 
 153 NY 534, 539;
 
 Coan v Coan,
 
 86 AD2d 640, 641,
 
 appeal dismissed
 
 56 NY2d 804). Moreover, the party to be held in contempt must have had knowledge of the order, although it is not necessary that the order actually have been served upon the party
 
 (e.g., People ex rel. Stearns v Marr,
 
 181 NY 463, 470,
 
 supra).
 
 In addition, prejudice to the rights of a party to the litigation must be demonstrated
 
 (see,
 
 Judiciary Law § 753 [A];
 
 Matter of McCormick v Axelrod,
 
 59 NY2d 574,
 
 supra).
 
 We are satisfied that the City itself was justifiably held in contempt on this record.
 

 We reject the City’s argument that the 1983 Directive (83 ADM-47) that emergency housing be provided immediately could not be met. The record reflects that as many as 100 families were forced to stay in the EAU offices overnight on some days. The feasibility of obedience, however, is not before us at this time, nor are intractable or herculean municipal efforts of a financial or political variety. The case is before us with detailed and affirmed findings of a serious, significant
 
 *227
 
 and persisting failure to comply with judicial decrees framed and particularized in part by reluctant acquiescence and negotiation by the City itself.
 
 Matter of Bonnie H. (Rose H.)
 
 (145 AD2d 830,
 
 lv dismissed
 
 74 NY2d 650,
 
 supra)
 
 is instructive:
 

 "Judiciary Law § 753 (A) (1) provides that a court may punish for contempt the neglect or violation of a duty, or other misconduct, by disobedience to a lawful mandate of the court or a Judge thereof, as a result of which the right of a party in a civil action or special proceeding is defeated, impeded, impaired or prejudiced
 
 (see, Matter of McCormick v Axelrod, *
 
 * *). Respondent’s argument that he acted in good faith and in the best interests of the children is of no avail
 
 (see, Matter of Sentry Armored Courier Corp. v New York City Off-Track Betting Corp.,
 
 75 AD2d 344;
 
 Matter of Williams-ville Teachers Assn. v Hatch,
 
 62 AD2d 1144). It is Family Court which makes the order of disposition of children found to be neglected (Family Ct Act § 115 [a] [i]; § 1013 [a]) and once the order is made, respondent has no discretion but to comply with that order” (145 AD2d 830, 831,
 
 supra).
 

 Insurmountable proof of municipal noncompliance was assembled and no escape theories are available on this record. Courts are justified and enjoy few alternative options in such circumstances except to exercise their "inherent power to enforce compliance with their lawful orders through civil contempt”
 
 (Shillitani v United States,
 
 384 US 364, 370). Since we agree that immediately means "immediately”
 
 (see, Matter of Ayers v Coughlin,
 
 72 NY2d 346) and that overnight stays in the City EAUs are not permissible
 
 (see, McCain v Koch,
 
 70 NY2d 109,
 
 supra),
 
 we should uphold the Appellate Division’s determination that Justice Freedman was ultimately left with no alternative but to find contempt and acted on a cogently documented record. Indeed, on the morning of November 20, 1992, she was faced with the harsh reminder of noncompliance as more than 30 families with children were shown to have slept the previous night on the floors, chairs and tabletops of City EAUs.
 

 B.
 

 The four City officials, however, argue that they should be judged differently from the City. We discern no basis in law
 
 *228
 
 or the record, however, to absolve the individual agents of the City who performed or failed to perform the ordered acts, while holding the abstract principal, the City, responsible and in contempt for the very same failure to comply. The individual defendants were sufficiently aware of the prior orders in
 
 McCain
 
 and
 
 Larnboy,
 
 the prior contempt proceedings, and the unacceptable and unauthorized circumstances and conditions surrounding the use of the EAUs
 
 (see,
 
 Sup Ct, NY County, Nov. 20, 1992, Freedman, J., at 23). The City and the individual contemnors had adequate and sufficient notice of decrees and the contempt proceedings against them for their individualized responsibility and noncompliance. The very agents invested by the City to administer the homeless shelter system can hardly be heard to complain that they were unaware of the court orders, which they had so directly and actively been attempting to comply with or avoid compliance with for over four years.
 

 Furthermore, the individual officials were specifically responsible for fulfilling the City’s municipal obligations to take appropriate steps to comply. Therefore, these individuals were properly held responsible personally for their failure to act for the benefit of their municipal principal — which could act only through them — by taking appropriate steps necessary to comply with the prior court orders
 
 (see, Matter of McCormick v Axelrod,
 
 59 NY2d, at 583,
 
 supra; Matter of Bonnie H. [Rose H.],
 
 145 AD2d 830,
 
 supra; Matter of Ward v Buric,
 
 176 AD2d 571;
 
 compare, Spallone v United States,
 
 493 US 265, 276). To hold otherwise on this record would create an unwarranted precedential loophole and exception for public officials to escape appropriate public accountability in judicial forums for failure to comply with court orders. The sanction and availability of contempt in such circumstances on a properly presented evidentiary record must be maintained. Governmental entities and their agents should, like any other party, be held to compliance and sanctions for indifference, dereliction or defiance of judicial decrees.
 

 Thus, because we hold that the finding of contempt against the City is well supported on this record, we likewise rule against the responsible agents of the City. By like analysis, we are satisfied that the imposition of remedial fines against the City should suffice as the entire remedy for the conduct of the City and its agents in the circumstances and eventuations of the case.
 

 
 *229
 
 As to the imposition of civil contempt penalties imposed on the parties, we look to their remedial nature and effect
 
 (State of New York v Unique Ideas,
 
 44 NY2d 345,
 
 supra).
 
 Supreme Court directed the City to pay fines to families not properly sheltered as required by the court orders during the period September 20, 1991 to November 20, 1992 in accordance with the denoted schedule
 
 (see,
 
 Sup Ct, NY County, Dec. 8, 1992, Freedman, J., at 7 [$50 for the first night, $100 awards per family per additional night]), which imposed fines to be directly paid to the aggrieved homeless families as "indemnification pursuant to Judiciary Law § 773”
 
 (id.,
 
 at 7).
 

 These fines against the City are as remedial as could be developed within the discretionary, equitable powers of the courts under the unusual circumstances of these matters. Thus, we affirm the Supreme Court’s imposition of these fine sanctions payable to those homeless families who were forced to spend nights at the EAUs with the confidence that these fines will serve as appropriate recompense for the failure to comply with the mandates of the courts
 
 (Matter of Department of Envtl. Protection v Department of Envtl. Conservation,
 
 70 NY2d 233, 239).
 

 IIL
 

 On the plaintiffs’ cross appeal, seeking to reinstate the sanction of overnight "stays” imposed on the individual officials, we agree with the Appellate Division’s unanimous modification and we essentially affirm that portion of the order. While "remedial powers of an equity court must be adequate to the task * * * they are not unlimited”
 
 (Whitcomb v Chavis,
 
 403 US 124, 161). Thus, in selecting contempt sanctions, a court is obliged to use the " ' "least possible power adequate to the end proposed” ’ ”
 
 (Spallone v United States,
 
 493 US 265, 276,
 
 supra,
 
 quoting
 
 Anderson v Dunn,
 
 6 Wheat [19 US] 204, 231). We agree with the Appellate Division that, in this case, the unusual circumstances of this municipal government problem of mammoth proportions and complexity do not warrant the imposition on appointed officials of overnight stays in EAUs
 
 (see, N. A. Dev. Co. v Jones,
 
 99 AD2d 238, 240;
 
 see also, State of New York v Unique Ideas,
 
 44 NY2d 345,
 
 supra; People ex rel. Stearns v Marr,
 
 181 NY 463, 471,
 
 supra; Matter of Sentry Armored Courier Corp. v New York City Off-Track Betting Corp.,
 
 75 AD2d 344, 345). While this severe sanction may be within a court’s power to
 
 *230
 
 induce compliance or remedy noncompliance with a court’s mandate for particularly egregious conduct or willful inaction
 
 (see, Matter of Department of Envtl. Protection v Department of Envtl. Conservation,
 
 70 NY2d 233,
 
 supra),
 
 this case, as against these municipal officials, does not qualify for that sanction.
 

 The remittal to the trial court for imposition of a replacement sanction against the individual defendants is, however, unnecessary and inappropriate in this case. None of the four holds the same office and responsibility in City government and some are entirely gone from the new administration that took office at the beginning of 1994. Thus, imposition of replacement sanctions for the contempts of the former and different appointed officials would serve no judicial or party purpose appropriate to civil contempt sanctions, inasmuch as they acted solely in their official capacities in all events.
 

 IV.
 

 We close then with an echo of the words of the Appellate Division that "it can hardly be disputed that all the parties involved in this contempt proceeding, including defendants [and their successors in office and responsibility], have a vital interest in finding an operative solution to the City’s homeless crisis” (192 AD2d 217, 220,
 
 supra).
 
 While political solutions for complex societal problems like homelessness test the foundations of government, the adjudication of contempt is all that this record presents in the judicial process and sphere. We consider the precise issues in this case only and consider them closed and at an end. All other arguments and claims have been considered and are either without merit, without need for further discussion, or subsumed in the rest of this opinion.
 

 Accordingly, the order of the Appellate Division should be modified, without costs, by striking only the provision of the Appellate Division’s order directing remittal to Supreme Court and, as so modified, affirmed. Only because of the technical modification, the certified question should be answered in the negative.
 

 Chief Judge Kaye and Judges Simons, Titone, Smith, Levine and Ciparick concur.
 

 Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed, and certified question answered in the negative.