OPINION OF THE COURT
Daniel Turbow, J.
This case addresses the scope of the authority of the Administration for Children’s Services of the City of New York (ACS or the Agency) to supervise children committed to its care and custody pending the outcome of proceedings brought under article 7 of the Family Court Act to determine whether a person is in need of supervision (PINS Proceedings). At its most basic, ACS takes the view that if a child simply wishes to *132 walk away from the custody of ACS it cannot take any steps to stop him. The court believes that this position makes a mockery of the prescribed processes and is flatly contradicted both by the plain language of article 7 and common sense.
On the particular facts at issue here, this position also manifested itself in conduct which directly violated the terms of a court order. By order dated October 24, 1997 (the October 24 Order), this court remanded respondent to the custody of ACS, and directed ACS “to take all lawful steps which are reasonably necessary to assure that [the respondent] does not abscond from the custody of ACS, and returns to Court.” Instead of making any effort to comply with this order, on the day following its issuance, ACS gave respondent money to leave the group home in which he was housed so that he could go, unescorted, to the movies. As should have been plainly anticipated, respondent used the opportunity to abscond from ACS’ custody. For the reasons set forth below, the court finds that this complete and total disregard of its directive is inexcusable and constitutes civil contempt.
A. FACTS[1]
1. Background
Respondent Darren H. was born on May 4, 1983. On September 12, 1997, respondent’s father, petitioner Larry H., commenced the instant proceeding by filing a PINS petition. The petition alleged that respondent had “absconded” on September 7, which was “the second time since June.” It further stated that respondent “breaks curfew, is truant, associates with undesirable companions, and is a behavioral problem * * * in school.” Petitioner sought a warrant for the child’s arrest, and “remand to a diagnostic and treatment program.” A warrant was issued on September 12, as authorized by Family Court Act § 738.[2]
On September 16, 1997, respondent returned to court voluntarily and appeared before the undersigned. The Legal Aid So *133 ciety was appointed to serve as his Law Guardian and the warrant was vacated. Petitioner, however, refused to take respondent home, asserting that he could no longer appropriately supervise his son’s conduct. Accordingly, respondent was remanded to the custody of ACS in accordance with Family Court Act § 739. The matter was set down for a fact-finding hearing on September 19.
On September 19, the court was informed that respondent was being housed by ACS at the Saint John’s group home.* *[3] The matter was adjourned to October 8.
On October 8, the court was informed that respondent had run away from Saint John’s on or about September 20. This confirmed information previously provided to the court in a letter dated September 20 from respondent’s paternal aunt, J. H. N. According to Ms. N., upon running away from Saint John’s, respondent arrived at his “Grandmother’s home, hungry, dirty and shaken and said that his pants and underwear were taken from him at St. John’s Group Home.” Ms. N. also recounted with eloquent simplicity the family’s frustration at the inability to break the cycle of respondent’s behavior and the PINS’ system’s inadequate response:
“This was the fourth occurrence in which Darren has run away from home within the last three months.
“Here’s what I have been told * * * there is nothing we can do until he does something, i.e. drugs, stealing, you know, criminal. Sir, that is what we don’t want. Why does the system only want to intervene after the fact? Although my nephew’s behavior is bad, he does not steal or use drugs. However, no one seems to understand that if he continues to run away from home for weeks on end that he will get hungry and be forced to commit a criminal act.
“I feel that * * * children like my nephew go through a revolving door, sitting and waiting for something ‘criminal’ to happen before any help is given.”
At the October 8 hearing another warrant for respondent was issued.
*134 2. The October 24 Proceedings
On Friday, October 24, respondent was arrested at his grandmother’s home and returned to court. Based upon information suggesting that respondent had become violent and threatened suicide, the court directed that respondent undergo an emergency evaluation by the Family Court’s Mental Health Services (MHS). Following his interview with respondent, Dr. Robert Giuliano, the Senior MHS Psychologist, concluded “that [respondent] was not an imminent threat to himself or other people and that he did not require psychiatric hospitalization.” Nonetheless, he did find that Darren was “in need of a diagnostic placement because there are numerous psychological issues * * * that he has * * * accompanying his acting-out behavior.” As elucidated in his written evaluation, Dr. Giuliano’s “recommended intervention” was a “Residential diagnostic facility that has on-site mental health professionals who can provide crisis intervention [to] Darren, father & grandmother.”
The question then arose as to where respondent was to be housed by ACS pending further proceedings. Counsel for ACS[4] informed the court that Darren would ultimately be housed in a particular type of facility that might be directed by the court, such as a structured residential treatment center. However, with respect to where Darren would go immediately from court, ACS counsel could not say. According to counsel, respondent would be taken to an ACS office in room 570 of Family Court to await transportation to a facility to be selected by the ACS department known as “Allocations”. In counsel’s words, “He would go to whatever facility would be available, just have a bed available to him this evening”.
On the record, the court then ordered that Darren be remanded to ACS under conditions that would assure he be housed and safeguarded appropriately:
“I am directing A.C.S. assume custody of this young man. That he be placed in an appropriate facility pending fact finding. I believe that appropriate facility will be one of the type recommended by the doctor * * *
“/ am also directing that A.C.S. take appropriate steps to assure that he is safely delivered and maintained at that facility *135 until there is a fact finding on the PINS matter. I am directing A.C.S. to take any appropriate steps it believes necessary to get the young man to the facility to keep him there.” (Emphasis added.)
Colloquy was then had concerning the precise limits of ACS’ authority to keep Darren from running away. ACS counsel stated that he did not “believe the Court is asking the Commissioner to do — the Commissioner can’t lawfully do — we can’t * * * physically restrain him.” The Law Guardian echoed this view.
The court made clear to the parties that it disagreed with this interpretation of the controlling law. Rather, the court stated that when detention is ordered pursuant to Family Court Act § 739, and the child is then given to the custody of ACS in accordance with Family Court Act § 720, ACS may not simply let the child walk away from custody. Accordingly, the court directed that ACS could and should, if appropriate to the circumstances, utilize a variety of measures, including those involving physical restraint, to comply with the court’s order to keep respondent in the Agency’s custody:
“[I]f he appears to be walking towards the door at one in the morning, I expect you to restrain him and not [let him] leave * * *
“Let me make myself very clear, if you have to lock the door to keep him from going out and keep the key away from him, I will authorize you to do that * * *
“[I]f it is necessary for A.C.S. or the Commissioner of Social Services to retain additional security guards to make certain this young man doesn’t run away, you should do so.”
Critically, however, the court did not attempt to prescribe the specific actions ACS could lawfully take to effect the order. Instead, it directed ACS to take only those steps, and subject respondent to the degree of restraint, “that any custodian of a child can be expected to exercise, what is reasonable under the circumstances.” As summarized by the court: “I’m saying reasonable. I don’t know what will be reasonable under the circumstances but I don’t want this young man out running away.”
The court memorialized its directives in the written October 24 order, by which ACS was “directed to take such steps as are lawful and reasonably necessary to assure that he is delivered to and maintained in [the type of] facility [recommended by Dr. Giuliano] or any other facility or place in which he is housed *136 pending delivery to such facility. Specifically, among other things, A.C.S is to take all lawful steps which are reasonably necessary to assure that he does not abscond from the custody ofA.C.S and returns to Court.” (Emphasis added.)
The matter was then set down for fact-finding on the following Monday, October 27.
3. ACS’ Conduct Following the October 24 Order
On October 27, when the case was called, the court learned that Darren had been returned to Saint John’s on October 24, but had absconded the next day. As subsequently explained by ACS counsel on November 18, no steps were taken to keep him under ACS’ control. Instead, he had been given monies to go to the movies, unescorted:
“acs counsel: [Darren] was granted a movie privilege, which is quite normal for this group home that houses twelve [to] fourteen year olds. [Darren] was given eight dollars to go to a movie at 3:35 that afternoon. He and * * * two or three other boys, in other words a group, the other boys went to the movies, he apparently just took oif* * *
“Also the group home requires one house parent to be in the facility at all times * * * There is not one on one supervision, nor is it required. This place is really more, I think like a college dorm not a reform school.”
ACS counsel acknowledged that ACS has other types of facilities subject to its jurisdiction, but that Darren had been sent to the group home because the October 24 proceeding had ended after 6:00 p.m. and ‘You can’t pick and choose at that hour.”[5]
*137 4. The Instant Motion
On December 10, 1997, the court issued the order to show cause which brought on this contempt proceeding.[6] The matter was thereafter briefed and argued. The petitioner father urges that a contempt finding be made. ACS and the Law Guardian disagree.
B. DISCUSSION
As set out by petitioner, the argument in support of a contempt finding is straightforward: ACS was directed by the October 24 order to take steps to prevent Darren from absconding and acted contumaciously when it failed to take any such steps. ACS, echoed by the Law Guardian, raises two main arguments in response.[7] First, it contends that it simply has no authority to keep a PINS respondent in its custody against the respondent’s will. Second, it asserts that the October 24 order was too vague to permit a contempt finding for its violation. Neither argument has merit.
1. The Statutory Authority
An examination of the issue must begin with the language of Family Court Act § 739, which authorizes the detention of PINS respondents before fact-finding under certain circumstances. As is relevant here that section provides:
“§ 739. Release or detention after filing of petition and prior to order of disposition
“(a) After the filing of a petition under section seven hundred thirty-two, the court in its discretion may release the respondent or direct his detention. In exercising its discretion under this section, the court shall not direct detention unless it finds and states the facts and reasons for so finding that unless the respondent is detained:
*138 “(i) there is a substantial probability that he will not appear in court on the return date', or
“(ii) there is a serious risk that he may before the return date do an act which if committed by an adult would constitute a crime.”[8] (Emphasis added.)
By its very terms, therefore, the PINS statute authorizes the detention of a PINS respondent before fact-finding for the precise purpose of assuring that he will be returned to court so that the case may proceed. ACS’ view — that it cannot take any steps to assure that a child remanded to its care under section 739 is indeed safeguarded until his return to court — renders section 739 entirely meaningless. Nor can that view be reconciled with the over-all structure of the PINS process.
By definition, article 7 is designed to deal with children “in need of supervision” (Family Ct Act § 711 [emphasis added]), i.e., those youths who, among other things, might be “incorrigible, ungovernable or habitually disobedient and beyond the lawful control of parent or other lawful authority”. (Family Ct Act § 712 [a] [emphasis added].) Accordingly, the statute authorizes, at the commencement of a PINS proceeding, the arrest of a respondent against his will in order to have him brought before the court, if it is believed that he or she will not appear in response to a summons. (Family Ct Act § 738 [d].) At the conclusion of the proceeding, the respondent may be placed involuntarily in a facility for an initial period of 18 months. (Family Ct Act §§ 754, 756.) Plainly then, operation of the PINS process is not contingent upon a respondent’s voluntary participation. {See, Matter of Cassandra R., 155 Mise 2d 756, 759 [Fam Ct, Bronx County 1992] [“PINS proceedings have been described as quasi-criminal in nature” (citations omitted)]; *139 see also, Family Ct Act § 718 [c].)[9] Yet, according to ACS, once arrested, the respondent can simply leave the custody of the agency to which he is remanded and thus effectively avoid the court’s processes. This position belies common sense.
As a practical matter this position has also led to a tragic and surreal spectacle routinely witnessed in Kings County Family Court: a respondent who has been on the streets without supervision is arrested at the behest of frantic parents seeking the assistance for their child theoretically offered by the PINS statute; the respondent is brought to the court, and remanded to ACS pending a scheduled fact-finding hearing; the respondent absconds from ACS custody — often before the case file leaves the courtroom; and the parent returns to the court for another warrant. The cycle then repeats itself. In the end, the parent grows emotionally and physically exhausted by the repeated trips to court, only to be told that the child has run off once again. The parent finally gives up, defeated by the very system to which it turned for help. As the letter from respondent’s aunt quoted earlier exemplifies, the tragedy is further enhanced by being told that nothing can be done to bring the child under supervision until he or she commits a criminal act and becomes subject to the purportedly stricter constraints of the delinquency process.
Properly construed, the statute does not permit this result. Instead, it authorizes the involuntary detention of a respondent at risk of flight. Indeed, by its terms, Family Court Act § 720 requires, at least outside of New York City, that such detention be had in a “detention facility”[10] certified by the Of- *140 flee of Children and Family Services (OCFS).* [11] And, while the detention facility must be “nonsecure”, i.e., characterized by the absence of “physically restricting construction, hardware and procedures” (Family Ct Act § 712 [d]), its residents are necessarily subject to extensive supervision by which their behavior may be controlled and their escape prevented.
Although there is no New York case directly addressing the issue, the New Jersey Supreme Court has cogently described the appropriate principles governing the relationship between the custodian and child in this context. In State of New Jersey in Interest of M. S. (73 NJ 238, 244, 246, 374 A2d 445, 448 [1977]), that court discussed the level of supervision that could be exercised over “Juveniles in Need of Supervision” (JINS) who were housed in “shelter care facilities” which also lacked the “hardware and procedures” typical of “secure” detention facilities:
“A JINS placed in a shelter care facility obviously is in the custody of the person in charge of the shelter and is not free to come and go at will. Furthermore, leaving such a facility without permission is contrary to the notion of parental supervision and control which shelter care is designed to provide * * * The unauthorized leaving of a shelter is symptomatic of the very problem for which shelter care is being provided * * *
“The solution [to preventing unauthorized departures] lies in the exercise of stricter supervision and control of the JINS by shelter care personnel. A JINS who is prone to leaving without authorization should be housed in an area where going and coming can be observed and better regulated. Shelter care fa *141 cilities are ‘without physical restriction.’ N.J.S.A. 2A:4 — 43(d). This means that bars, cells, handcuffs and other means of forcible restraint may not be used in a shelter facility. However, this does not mean that some limitation may not be placed on a JINS’s freedom of movement. Those in charge of a shelter facility stand in Loco parentis of a JINS in their custody and would be entitled to exercise the parental control necessary to safeguard the JINS’s own welfare. The firm exercise of authority, closer supervision, and the use of shelter areas where going and coming can be more easily observed should in most cases provide adequate means of controlling unauthorized departures.” (Emphasis added.)
ACS does not argue that, as a general matter, PINS respondents may not be subject to this level of supervision in an upstate “nonsecure detention facility”. Instead, as noted above, it argues that such supervision may not be exercised upon PINS respondents in New York City because Family Court Act § 720 (4) requires that they be housed in foster care facilities and the regulations governing those facilities bar such supervision. ACS has misread both the specific language of the statute as well as its context.
Family Court Act § 720 (4) does indeed direct that detention of PINS respondents in New York City be in a “foster care facility” under the jurisdiction of ACS. However, the section goes on to expressly state: “In all other respects, the detention of such a person in a foster care facility shall be subject to the identical terms and conditions for detention as are set forth in this article and in section two hundred thirty-five of this act” (Family Ct Act § 720 [4] [emphasis added]).[12]
This language plainly authorizes ACS to exercise the identical level of supervision over PINS respondents in foster care facilities in New York City as may be exercised over PINS respondents in detention facilities elsewhere. As has been demonstrated, that level of supervision includes the exercise of such authority as may be reasonably necessary to prevent a PINS respondent from absconding.
The fundamental flaw in ACS’ position is its assumption that all children housed in “foster care facilities” must be treated alike. In fact, the legislative history of the bill which enacted subdivision (4) of section 720 (L 1987, ch 419) reveals that it contemplated that PINS respondents would be treated differently than children housed in foster care facilities by rea *142 son of, for example, their placement under article 10 of the Family Court Act. Moreover, it strived to assure that PINS respondents in New York City would be subject to the same terms and conditions of detention as their upstate counterparts, notwithstanding their being housed in a “foster care facility”. Thus, the bill even required that the cost of detention be absorbed as it was elsewhere, and that the facilities become subject to joint supervision by the State Department of Social Services and the Division for Youth, which supervised detention facilities elsewhere. (L 1987, ch 419, § 2, amending Executive Law § 510-a.)[13]
The purpose and intended effect of the bill is set forth in a memorandum submitted in its support to the Governor’s Office by the New York State Department of Social Services: “Subdivisions 2 and 3 of Section 720 would be amended to provide that an alleged or adjudicated PINS must be detained in a facility certified by the Division [for Youth] as a [non-secure] detention facility * * *
“New York City does not, however, have a sufficient number of non-secure detention beds * * * Therefore, several sections of the bill would carve a specific exception * * *
“The bill would amend subdivision 4 of Section 720 * * * to mandate the Family Court in New York City to direct that the detention of all such persons occur in foster care facilities established and maintained pursuant to the Social Services Law and supervised by the Department. The bill would require that, in all other respects, such detention must be subject to the same terms and conditions of Article 7 governing detention of PINS in non-secure detention facilities * * *
“The traditional purpose for detention is to protect the community and the youth from the youth’s actions * * * Article 10 of the Family Court Act authorizes the temporary placement of youth who have been abused or neglected by their parents, including youth who have no home. In addition, under Sections 384 and 384-a of the Social Services Law, parents * * * may transfer the care and custody * * * to * * * an authorized agency.
*143 “By keeping the traditional reasons for detention, the bill would ensure that an alleged PINS youth is placed in detention only if he or she might act in an improper manner if released before the next court date. However, if a youth needs placement because of actions beyond his or her control, then the youth must be remanded to foster care under a separate section of law without being labeled a PINS.” (Mem from Cesar A. Perales, Commr of NY St Dept of Social Ser vs, to Evan A. Davis, Counsel to Governor, dated July 21, 1987, at 3-6, Bill Jacket, L 1987, ch 419 [emphasis added].)
Given the foregoing, it' appears that ACS has lost its focus when it argues that the regulations of the Department of Social Services governing “foster care facilities” prevent it from taking steps to prevent children housed in such facilities from leaving its care. The emphasis must be on the child at issue and that child’s needs, and not the place the child is housed per se. Indeed, the Court of Appeals has so held in a related context when analyzing whether it was appropriate to place a PINS respondent in a State training school: “It is urged that placement of a PINS child in a training school is unlawful per se under our decision in Matter of Ellery C. (32 N Y 2d 588). We disagree. The main thrust of our holding in Ellery C. was that it is inconsistent with the statutory right to ‘supervision’ and ‘treatment’ to place PINS children in institutions in which juvenile delinquents are confined. (32 N Y 2d, at p. 591.) We said it is the confinement of PINS children in a prison atmosphere along with juveniles convicted of committing criminal acts that is proscribed, and not the fact alone of placement in a training school. Put another way, it is the adequacy of the supervision and treatment there provided, not the characterization of the facility as a training school, that is determinative.” (Matter of Lavette M., 35 NY2d 136, 141 [1974] [emphasis added].)
In sum, it may be that children placed in foster care pursuant to Family Court Act article 10 are not subject to “detention” and all that it implies. However, the applicable law subjects PINS respondents to that level of supervision. ACS may not escape its responsibilities by arguing that it houses PINS respondents with children in foster care and allegedly does not have the resources to supervise all its charges so closely. (See, Apr. 6, 1998 affirmation of Mitchell Regenbogen [4/6/98 Regenbogen Aff.] 4 [ACS would be required to “single out a resident of facility for ‘court-directed’ detention, such as that the Court apparently had in mind for” respondent here].) *144 ACS must meet its statutorily imposed obligations to house PINS respondents appropriately. (See, Matter of Ellery C., 32 NY2d 588, 591, 591-592 [1973] [“Proper facilities must be made available to provide adequate supervision and treatment for children found to be persons in need of supervision” “Nor may the appellant’s (inappropriate) commitment to the State training school be justified by the respondent’s claim that, ‘while not ideal, (it) is the only facility available’ ”].)
Finally in this regard, even were the Department of Social Services regulations governing foster care facilities relevant, their application would not provide an excuse for ACS’ failure to comply with the October 24 order.
In the main, ACS focuses on 18 NYCRR 441.17, entitled “Restraint of children in care.” According to ACS, “a careful reading of that regulation, along with sections 448.3 and 447.2 * * * show the conspicuous absence of any reference whatsoever to the usage of restraint or even reduction of privileges in order to keep children from absconding or ensuring their appearance in Court.” (Apr. 6, 1998 Regenbogen affidavit 4.) This interpretation by ACS is faulty and overly constrained.
The cited regulations define “restraint” as “the containment of acute physical behavior by physical, mechanical, or pharmacological intervention, or room isolation”. (18 NYCRR 441.17 [a] [1].) The regulations do, as ACS argues, limit the circumstances under which such restraint may be used. However, they also provide flexibility to use other supervisory tools which may prove effective in preventing a child from leaving the custody of ACS.
Thus, for example, the regulations expressly exclude the following from the definition of “restraint”: “time out, confinement of a child to his own room for treatment or disciplinary reasons or use of a locked unit.” (18 NYCRR 441.17 [a] [1].) “Time out”, in turn, means “the removal of a child from a situation that is too threatening or emotionally overwhelming for the child * * * or where the child has exceeded the reasonable limits set by the staff.” (18 NYCRR 441.17 [a] [7].) “Locked unit” means “a program approved by the department that is contained with a closed unit and is designed to serve a special population.” (18 NYCRR 441.17 [a] [8].) ACS has not explained why any of these tools and techniques could not properly be utilized to keep a child from leaving its custody. Indeed, glaringly absent from its presentation is any discussion of what it believes it may do in order to supervise children in its care.
Moreover, the regulations define “acute physical behavior” as including “behavior which clearly indicates the intent to inflict *145 physical injury upon oneself or others”. (18 NYCRR 441.17 [a] [2].) It plainly can be hypothesized that when a child leaves the care of ACS unescorted, and goes into the City streets without supervision, he is manifesting an intent that may result in the “infliction of physical injury upon” himself which warrants the use of restraint.
Most importantly, as the following colloquy reveals, the interpretation of the regulations advanced by ACS permits conduct which is irrational and unconscionable:
“the court: Can an 8 year old walk out [from an ACS facility] into the street?
“acs counsel: We have gotten warrants for 8 [year olds] who ran away.
“the court: An 8 year old can walk out at 3 in the morning? “acs counsel: If you’re implying that is what they do and encourage it, the answer is no.
“the court: No, but do they walk out the door?
“acs counsel: They can.
“the court: And you don’t stop them?
“acs counsel: They can’t physically stop them.”
It hardly requires citation of authority for the proposition that the regulations cannot be interpreted in a manner which permits children to be put at such terrible risk. Suffice it to say, ACS is considered to be parens patriae of children in its care, and has a duty to supervise them appropriately. (See generally, Bartels v County of Westchester, 76 AD2d 517, 521 [2d Dept 1980].) That duty would be breached by permitting a child — without any apparent regard to age or competence— simply to walk alone and unprotected onto the City streets in the middle of the night. Indeed, depending on the particular circumstances, such conduct by a parent could easily constitute neglect under Family Court Act article 10. (See, Family Ct Act § 1012 [f].)[14] The regulations cannot be interpreted to permit such a result. (See, Matter of Krauskopf v Perales, 173 AD2d 387, 389 [1st Dept 1991] [“where ** * * the construction (of regulations) advanced (by the agency) is irrational or unreasonable, the court will properly reject that construction in favor *146 of one consistent with the plain language of the statute or regulations” (citations omitted)].)
In sum, the court flatly rejects the view that PINS respondents, such as the respondent here, who are remanded to the custody of ACS pursuant to Family Court Act §§ 739 and 720, may walk away from ACS custody at will. Instead, the court finds that ACS had the authority to take reasonable steps to prevent the respondent from absconding from its custody as directed by the October 24 order.
2. The Sufficiency of the October 24 Order and ACS’ Response
Thereto
According to ACS, the October 24 order was too vague and nonspecific to permit a contempt finding for its violation. Indeed, ACS claims the only enforceable order that might have issued was one that specifically directed it to take particular steps to prevent Darren from absconding, such as “sealing the windows” or “locking respondent in his room”. (ACS mem of law [ACS Memo], at 8.) As it was written, however, the October 24 order was effectively unenforceable since it “left the decision about what steps to take up to the agency.” (Ibid.) This contention may be summarily dismissed.
It is true that a finding of contempt may only be predicated upon violation of a “lawful order of the court, clearly expressing an unequivocal mandate” (Matter of McCormick v Axelrod, 59 NY2d 574, 583 [1983]). However, notwithstanding ACS’ protestations, the October 24 order did set forth such an “unequivocal mandate”. By its terms, it directed ACS to take specific action, i.e., to take all lawful steps reasonably necessary to maintain respondent in the Agency’s care so that he could be returned to court. The order is not impermissibly “vague” simply because it does not specifically set forth the particular actions the agency should have taken to comply with the court’s directive.
In addition, the terms and enforceability of the October 24 order must be examined with regard to the context in which it was issued. (See, Matter of Greenpoint Hosp. Community Bd. v New York City Health & Hosps. Corp., 114 AD2d 1028, 1031-1032 [2d Dept 1985].) Here, the provision of any more specific directions to the Agency would have unduly impinged upon the Agency’s discretionary authority to determine best how to supervise respondent so that he would not abscond. In other words, it was only the Agency — and not the court — who knew the scope of the Agency’s housing and supervisory resources, *147 and how they could be utilized so as to satisfy the court’s directive. ACS’ suggestion that the court should have “micromanaged” the Agency’s implementation of its directive must thus be taken with a grain of salt.
Moreover, while the court did not in its order specifically recite the precise steps ACS should take, ACS overstates its case when it argues that it was “given no direction as to what steps the Court had decided were lawful or reasonable.” (ACS Memo, at 8.) The record makes clear that the court instructed ACS that it rejected the Agency’s fundamental view that it was under no obligation to keep respondent from running away, and that it could use a variety of reasonably necessary and lawful means to keep him in custody. Indeed, the court suggested some possible tools, including the locking of the facility, hiring security guards and, under appropriate circumstances, physical restraint. It would have been impossible for the court to have ruled upon the legality of every possible form of supervisory response to every possible permutation of respondent’s conduct. Hence, it imposed the requirement that the supervisory conduct be “reasonably necessary” to effect the intended end.
Finally, in this context the contention that the October 24 order is insufficiently specific rings very hollow. This is not a case where a party has taken steps to comply with an arguably ambiguous order, and the adequacy of its compliance is at issue. (See, Matter of Department of Envtl. Protection v Department of Envtl. Conservation, 70 NY2d 233, 241 [1987] [“Where the order alleged to have been disobeyed is capable of a construction consistent with the innocence of the party, there * * * should be no adjudication of contempt” (citations omitted)].) Here, ACS took no steps at all to comply with the October 24 order. Instead, with full knowledge of respondent’s propensity to abscond, his participation in a violent incident on October 24, his fragile psychological state, and the court’s intent, it sent respondent to the movies. (See, Matter of Green-point Hosp. Community Bd. v New York City Health & Hosps. Corp., supra, 114 AD2d, at 1031-1032, 1032 [‘While the term ‘meaningful consultations’ may be vague when taken out of context, in the instant case the court clearly explained with specificity what it meant” “HHC’s claim that it had merely erroneously interpreted a vague order is belied by the facts”].) Under these circumstances, a finding of civil contempt is warranted. *148 [15] (See, McCain u Dinkins, 84 NY2d 216, 227 [1994] [“Courts are justified and enjoy few alternative options in such circumstances except to exercise their ‘inherent power to enforce compliance with their lawful orders through civil contempt’”], quoting Shillitani v United States, 384 US 364, 370 [1966].)
3. Sanctions
The matter is set down for conference on August 24, 1998, to discuss the nature and extent of appropriate sanctions. At that time, the parties should be prepared to discuss whether other forms of equitable relief may appropriately be awarded in view of the effect ACS’ actions may have on the conduct of other PINS proceedings. (See generally, McCain v Dinkins, 84 NY2d 216 [1994], supra.)
CONCLUSION
The effect of the order is stayed until July 27, 1998, to permit the parties to seek such appellate relief as they may deem appropriate.

. Unless otherwise indicated, the facts are not in dispute. Indeed, ACS has acknowledged that no evidentiary hearing is required with respect to the instant contempt motion. To the extent the Law Guardian disagrees, the court rejects her position. (See, Matter of Bonnie H., 145 AD2d 830, 832 [3d Dept 1988] [“Whether an evidentiary hearing was required (in a civil contempt proceeding) rested wholly within the discretion of the court”] [citation omitted].)

. That section permits the issuance of a warrant for a respondent in a PINS proceeding in a number of circumstances, including where “the sum *133 mons cannot be served” (Family Ct Act § 738 [a]), or “a summons, in the court’s opinion, would be ineffectual” (Family Ct Act § 738 [d]).

. The adjournment was occasioned by the fact that petitioner had apparently executed documents to “voluntarily place” respondent with ACS. (See, Social Services Law §§ 384, 384-a.) Such a placement could have mooted the PINS proceeding. It was subsequently learned, however, that the voluntary placement had not been finalized.

. At the request of the court, appearing at the October 24 hearing were senior attorneys from the ACS legal staff which routinely represent the agency in proceedings in Family Court. In addition, at that time, ACS was joined as a party.

. On October 27 a warrant was issued for Darren. On November 6, he was voluntarily returned to court. At that time the Law Guardian informed the court that a vacancy existed at the Pleasantville Diagnostic Facility, in Pleasantville, New York. On the consent of all parties the court directed that he be remanded to that facility. On the next day, he was transported there by his father. With the agreement of the parties he has remained there until today, receiving appropriate services, and doing very well. During this period a ‘Voluntary placement” was properly effected by the father (see, n 3, supra) and, as a result, the underlying PINS petition was recently dismissed on consent. ACS has not suggested that the dismissal moots the instant contempt proceeding.

. The court had previously conducted a conference on November 18 to discuss with the parties whether an order to show cause should issue.

. During the course of these proceedings, ACS had also implicitly or explicitly raised a number of other procedural arguments which, with the following exception, are either no longer pressed or not worthy of separate discussion. ACS has contended that the court could not, sua sponte, issue the order to show cause to hold the Agency in civil contempt. Instead, according to ACS, such a remedy can only be sought in the first instance by a party to the litigation. ACS is incorrect. (See, 21 NY Jur 2d, Contempt, § 84.) In any event, petitioner has represented that he would be prepared to bring on the identical contempt proceeding if necessary. Under these circumstances, dismissal of the instant motion, only to have it immediately refiled, would be nothing but a time-consuming elevation of form over substance.

. Section 739 goes on to limit the period of time a respondent may be detained: “(b) Unless the respondent waives a determination that probable cause exists to believe that he is a person in need of supervision, no detention under this section may last more than three days (i) unless the court finds, pursuant to the evidentiary standards applicable to a hearing on a felony complaint in a criminal court, that such probable cause exists, or (ii) unless special circumstances exist, in which cases such detention may be extended not more than an additional three days exclusive of Saturdays, Sundays and public holidays.”
In addition, Family Court Act § 747 requires that the fact-finding hearing “commence not more than three days after the filing of a petition * * * if the respondent is in detention.” The constitutionality of section 739 is not open to serious question. (See, Schall v Martin, 467 US 253 [1984] [construing parallel provision authorizing detention in delinquency proceedings].)

. This section permits the rearrest and forcible detention of a youth who has absconded: “If a child placed pursuant to this article in the custody of a commissioner of social services or an authorized agency shall run away from the custody of such commissioner or authorized agency, any peace officer, acting pursuant to his special duties, or police officer may apprehend, restrain, and return such child to such location as such commissioner shall direct or to such authorized agency and it shall be the duty of any such officer to assist any representative of the commissioner or agency to take into custody any such child upon the request of such representative.” (Family Ct Act § 718 [c].)

. In its entirety, section 720 provides:
“1. No child to whom the provisions of this article may apply, shall be detained in any prison, jail, lockup, or other place used for adults convicted of crime or under arrest and charged with a crime.
“2. The detention of a child in a secure detention facility shall not be directed under any of the provisions of this article.
*140 “3. Detention of a person alleged to be or adjudicated as a person in need of supervision shall be authorized only in a detention facility certified by the division for youth except as provided in subdivision four of this section.
“4. Whenever detention is authorized and ordered pursuant to this article, for a person alleged to be or adjudicated as a person in need of supervision, a family court in a city having a population of one million or more shall, notwithstanding any other provision of law, direct detention in a foster care facility established and maintained pursuant to the social services law. In all other respects, the detention of such a person in a foster care facility shall be subject to the identical terms and conditions for detention as are set forth in this article and in section two hundred thirty-five of this act.”

. As is relevant here, OCFS recently assumed the responsibilities of the State agency known as the Division for Youth (DFY). However, most of the statutes and other regulatory and legislative references cited in the course of this opinion predate the creation of OCFS and refer to DFY. For the sake of convenience, the court will use the agency’s names interchangeably.

. Family Court Act § 235 is irrelevant to the instant discussion.

. The relevant provision is now contained in Executive Law § 503 (4), which provides: “The division [for youth] shall visit and inspect all facilities used for detention * * * The department of social services shall cooperate with the division for youth to make arrangements for joint visitation and inspection of foster care programs * * * serving youth detained, in cities having a population of one million or more, pursuant to article seven of the family court act.”

. That section defines “neglected child” as including a child:
“whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent
* * * to exercise a minimum degree of care * * *
“in providing the child with proper supervision” (Family Ct Act § 1012 [f] [i] [B] [emphasis added]).

. The court does not find the Agency’s conduct to have been sufficiently willful to warrant a finding of criminal contempt. (See generally, Matter of Department of Envtl. Protection v Department of Envtl. Conservation, supra.)