OPINION OF THE COURT
Richard A. Dollinger, J.
More than a year ago, this court, citing an old refrain from a Gilbert and Sullivan operetta, asked whether a trial court could “ever” reinterpret what the court considered to be an ambiguous 2000 Appellate Division decision involving this couple. (Lo Maglio v Lo Maglio, 273 AD2d 823 [4th Dept 2000].) Quoting Captain Corcoran in H.M.S. Pinafore, this court concluded that such a reinterpretation of an appellate decision by a trial court “hardly ever” happened and then this court, relying on an unequivocal legislative command, did just that, modifying what this court considered a somewhat oblique directive in the 2000 Appellate Division decision for the husband to provide allegedly “permanent” health insurance for his wife. (Lomaglio v Lomaglio, 35 Misc 3d 1224[A], 2012 NY Slip Op 50855[U] [Sup Ct, Monroe County 2012].)
When the matter was again appealed to the Appellate Division, the appellate court subsequently reversed this court’s determination, citing res judicata, a raft of other legal theories improvidently ignored by this court and held that those doctrines barred “relitigation of previously adjudicated disputes” even if “erroneously decided, whether due to oversight by the parties or error by the courts.” (LoMaglio v LoMaglio, 104 AD3d 1182, 1183 [4th Dept 2013], revg 35 Misc 3d 1224[A], 2012 NY Slip Op 50855[U] [Sup Ct, Monroe County 2012].) In *830 so holding, the Appellate Division in 2013 joined the Captain in H.M.S. Pinafore, and delivered a decisive “no, never” to this court’s attempt to harmonize the prior Appellate Division decision and specific provisions of the Domestic Relations Law.[1]
With the matter remanded, this court now considers an application to enforce the 2000 Appellate Division order, as mandated by the 2013 Appellate Division decision and requires that the husband provide permanent “medical insurance coverage,” the “same” coverage as he provided during his marriage, to his long divorced and estranged wife, even though he has no current maintenance obligation (104 AD3d at 1184).[2] In its decision to reverse the decision of this court, the Appellate Division in 2013 stated that the law required it to:
“deny that part of plaintiffs cross motion seeking an order terminating his obligation to provide defendant with the same level of medical insurance coverage that he provided during the marriage, grant that part of defendant’s motion seeking an order directing plaintiff to provide defendant with that medical insurance coverage, and remit the matter to *831 Supreme Court for further proceedings on the remaining relief requested in defendant’s motion.” (LoMaglio v LoMaglio, 104 AD3d 1182, 1184 [4th Dept 2013], revg 35 Misc 3d 1224[A], 2012 NY Slip Op 50855[U] [Sup Ct, Monroe County 2012].)
This court, having parsed the 2000 decision of the Appellate Division in its original decision and, apparently having done so imprudently, is now cautious in considering what the appellate court has directed this court to do. As this court reads the decision, the Appellate Division has ordered that this court issue an order that the husband shall provide the wife with “that medical insurance coverage.” The appellate court’s use of the word “that” incorporates the earlier requirement in the previous phrase of its opinion that the husband “provide defendant [the wife] with the same level of medical insurance coverage that he provided [to her] during the marriage.” Importantly, this court notes that the Appellate Division, despite the obvious opportunity to do so, did not direct this court to order “permanent coverage” to the wife. The lack of that express direction raises a question as to the higher court’s intentions: it is unclear, in this court’s mind, whether the Appellate Division, expressly requires that this court order the husband to provide “permanent” medical insurance coverage to his wife. For some reason, the higher court, when asked to advise this court on whether its 2000 decision was “ambiguous,” has simply instructed this court to “do what you were told to do” and not specified exactly what it wanted done. Nonetheless, despite a clear direction, this court can only conclude that the Appellate Division — both in 2000 and 2013 — has ordered this court to have the husband provide “permanent medical insurance” coverage to his wife.
In this matter, the court, while preferring not to nitpick the words of the Appellate Division, must nonetheless also decide what the word “provide” means in this case, as the proof suggests that the husband and wife have different versions of what this word means in the Appellate Division decision: does it require the husband to apply for, obtain and maintain the medical insurance coverage on behalf of his wife — as the wife argues — or does it simply require the husband to pay for the insurance cost after the wife has applied for and obtained the coverage — as the husband argues.
The 2013 Appellate Division decision also directs this court to consider, de novo, the “remaining relief’ requested in the original January 4, 2012 order to show cause brought by the wife. (104 AD3d at 1184.) In the original order to show cause, the *832 wife sought a finding of contempt for the husband’s “failure to comply with the Appellate Division order,” a fine for such contempt, an order directing the husband to provide the wife “with the same level of medical insurance coverage that he had provided during the marriage,” a money judgment for payment of bills that the wife was forced to pay for herself and for unpaid bills caused by the husband’s failure to provide medical coverage and reasonable attorneys fees.
After the decision was rendered by the Appellate Division, the parties conferenced this case and the parties could not agree on the exact nature of the insurance coverage provided by the husband to the wife during the marriage.
In the face of an inability to resolve the nature of the prior coverage, the wife moved:
A. to hold the husband in contempt for failing to provide health insurance for his wife since 2008;
B. for an order directing the husband to provide the same level of medical insurance coverage that he provided during the marriage;
C. for an order defining the level of medical insurance coverage as including a series of specific health-related coverages;
D. for an order directing that such insurance would continue until either the husband or wife died;
E. for an order directing the husband to pay bills that the wife had accumulated since 2008; and,
F. for an award of legal fees to her counsel and to reimburse her for legal fees she had paid already.[3]
When the husband opposed the motion claiming that there were factual issues to be resolved regarding the type of medical insurance provided during the course of the marriage and the options available for future coverage, this court ordered a hearing on all the issues raised in the motion.
In reviewing this case, the court will not repeat facts already well-documented in the two lower court and two Appellate Division decisions that this couple have endured. (LoMaglio v LoMaglio, 104 AD3d 1182 [4th Dept 2013], revg 35 Misc 3d 1224[A], 2012 NY Slip Op 50855[U] [Sup Ct, Monroe County 2012]; Lo Maglio v Lo Maglio, 273 AD2d 823 [4th Dept 2000].) During *833 the hearing, there was a vigorous dispute over the scope and types of coverage that the wife had previously received while married and the method by which the husband claimed he “provided” medical insurance coverage. The husband also argued that the mandated insurance only applied to “medical insurance coverage” — excluding dental, vision and other coverages which the wife sought to have covered. At the start of the hearing, the parties stipulated that the wife had the burden of proof to establish the scope and type of coverage that existed during the marriage as a precondition to the court fashioning an order for coverage from 2008, when the coverage was discontinued, into the future.
In the hearing, the wife was the only witness to testify regarding the medical insurance coverage provided by the husband during the term of the marriage.[4] The wife testified that she had medical coverage, provided through the husband’s employer, “pretty much” throughout the marriage and that it was “good coverage.” The wife testified that she had coverage through Preferred Care, a local health maintenance organization. She described the health insurance plan as including medical and other coverage, including dental and vision. When asked to explain the extent of coverage, the wife testified that she had found a copy of an insurance contract from the 1990s, which the attorney suggested was from Preferred Care. The document was found in a file folder at her residence. Her attorney sought to introduce the alleged contract by questioning the wife about her knowledge of the document. After a hearsay objection based on the business records, the court refused to admit the document. When the document was denied admission, the court refused to let the wife testify to the contents of the document because her testimony would have been based on a document that was not admissible. The wife did not call any representatives of Preferred Care or any witness could describe the medical or other coverage provided during the term of the marriage. The wife never called any witnesses from Rochester Institute of Technology, where her husband was employed, to explain the available medical insurance coverage during the period of their *834 marriage.[5] There was no evidence of whether such coverage was still available to the husband for purchase or at what price. There was no evidence of any governmental programs, such as Medicaid or Medicare, that might currently provide medical insurance for the wife. The wife produced no other evidence of the extent of medical insurance coverage provided to her during the course of the marriage.
The wife admitted that the husband, from the time of the divorce until 2007, “provided” medical insurance to her. She admitted that he paid premiums for her health insurance during this time. The wife testified that, in 2007 after the divorce, she moved to Maryland to teach and acquired health insurance through her employer. The husband paid some premiums in Maryland, but after she lost that coverage, she testified that the husband then stopped paying her health insurance. She testified that she made repeated requests for payment, commenting that she and her attorney sent letters to the husband demanding payment. No letters demanding payment of the medical insurance premium for the wife were offered at the hearing. The wife testified further that she had obtained health coverage at some point after the husband stopped paying for her coverage and that the expense was almost $175 per month and further that there were unreimbursed co-pays associated with this coverage. The wife did not offer any documents regarding this coverage, its cost, the nature of any co-pays or any other details regarding the coverage she purchased after 2008. There were no receipts or evidence of payment of this coverage offered by the wife.
The wife also offered for admission a document described by her attorney as a package of medical and other health coverage bills. She briefly described these documents as proof of the costs and expenses incurred by her from 2008 until the date of the hearing and further claimed that the husband was liable for these expenses because he was required to provide health insurance during this time. When the husband’s attorney objected to the admission of the bills on the basis of hearsay, the court sustained the objection because the bills were the business records of the providers and there was no evidence that these fees and costs were charged to the wife or that the bills represented usual and customary fees and expenses for medically required *835 health care interventions. (People v Kennedy, 68 NY2d 569, 579 [1986] [noting the requirements of a business record according to CPLR 4518].)
Under cross-examination, the wife acknowledged that she was insured in the fall of 2007 through her employer in Maryland and admitted that she did not need coverage from her husband during that time. After she lost that coverage in early 2008, she testified that she contacted her husband “numerous times” and demanded that he pay her health insurance. Importantly, there is no evidence before the court that the wife, after 2008, ever applied for health insurance coverage. There is no evidence of any applications by the wife for medical insurance coverage from 2008 to the date of the trial. The wife never testified that she had been denied coverage by a medical insurance carrier.
After this testimony from the wife and without any other evidence regarding the scope of the “medical insurance coverage” during the marriage, “the same” medical insurance coverage provided by the husband during the marriage or the wife’s attempts to obtain coverage, the wife rested. The court denied the husband’s motions to dismiss and the husband then took the stand. The husband testified that, after the divorce, his attorneys and the wife’s attorneys negotiated a plan under which he would pay the wife’s health insurance if she did not obtain such insurance from her employer. If she was not working or otherwise needed coverage, the husband said he would make a monthly payment for health insurance. The husband produced a series of personal checks attesting that the husband paid health insurance costs for the wife directly to Preferred Care from the early 2000s until 2007. The checks were admitted by stipulation. The husband testified that he stopped paying the health insurance in late 2007 because he never got another bill for the health insurance from his wife or anyone else. He testified that after his wife lost her employment in Maryland in 2007, they discussed health insurance on the phone and he told her “send me the premium bill and I will pay it.” There is no evidence that the husband received any bills after that phone call. There is no evidence that the wife ever sent a bill for medical insurance coverage to her former husband after the phone call. There is also no evidence before the court that the wife was required to send bills to her husband: this court can find nothing in any prior order mandating that the wife bill the husband for “medical insurance coverage.”
The husband testified that in 2011, when his wife relocated to Rochester, his wife again contacted him and said she needed *836 coverage. He testified that he told her: “send me the premium and I will pay.” He testified that he insisted that he make the payments directly to the providers because he needed to know who provided the coverage and who to pay. When he never got any bills and had no further contact from his ex-wife, he made no payments and “assumed she had coverage.”
1. The Contempt Application
In considering the wife’s application for contempt, this court notes that the application for contempt does not contain the statutorily required notices under the Judiciary Law, but the husband’s counsel’s appearance, without further objection, waives this potential defense. (Matter of Cunha v Urias, 101 AD3d 996 [2d Dept 2012]; Matter of Laland v Edmond, 13 AD3d 451 [2d Dept 2004] [by contesting the father’s motions for contempt on the merits without timely objecting that they did not comply with the notice and warning requirements of Judiciary Law § 756, the mother waived any objections to the validity of the motions based on those requirements].) However, while one defense is waived, a second defense controls this determination. A contempt finding under Judiciary Law § 753 can only follow from a clearly defined court order. (McCain v Dinkins, 84 NY2d 216, 226 [1994] [to sustain a civil contempt, a lawful judicial order expressing an unequivocal mandate must have been in effect and disobeyed]; Matter of Rulinsky v West, 107 AD3d 1507 [4th Dept 2013] [no contempt unless a party violates an order expressing a clear and unequivocal mandate]; Obadiah v Shaw, 266 AD2d 520, 521 [2d Dept 1999] [“(t)o prevail on a motion to punish a party for civil contempt, the movant must demonstrate that the party so charged violated a clear and unequivocal court order”]; Tedesco v Tedesco, 13 Misc 3d 1245[A], 2006 NY Slip Op 52353[U] [Sup Ct, Westchester County 2006] [the proof would not support a contempt adjudication because there was no clear order prohibiting that conduct].)
In 2012, this court, in considering the 2000 determination of the Appellate Division, Fourth Department, determined that their judicial decree was ambiguous and, relying on the Domestic Relations Law, held that the husband had no further obligation to pay health insurance because the maintenance term had expired. While the Appellate Division reversed this court, this court nonetheless finds that the Appellate Division order, issued in 2000, was not a “clear directive” within the Judiciary Law sufficient to hold the husband in contempt for failing to pay for the insurance. The Appellate Division decision in 2000 said: *837 “because defendant’s medical condition is likely to be permanent, the court should have directed plaintiff to continue to provide the same level of medical insurance coverage that he provided during the marriage to the extent such coverage is not provided by defendant’s employer” (Lo Maglio v Lo Maglio, 273 AD2d at 824).[6] As this court noted in its decision in 2012, the Appellate Division decision in 2000 was contrary to the express wording of the Domestic Relations Law. While the Appellate Division in 2013 held that the prior court order requiring health insurance was valid under the doctrine of res judicata, this court concludes that the language of the Fourth Department decision in 2000 was not an unequivocal mandate to provide permanent medical insurance coverage especially when lined up against the statutory language in the Domestic Relations Law which prohibits the payment of health insurance beyond the duration of the maintenance payments.[7] Therefore, in this court’s view, no contempt can be found because the Appellate Division decision in 2000, when read carefully and weighed against the backdrop of the Domestic Relations Law, is not a clear, unequivocal order sufficient to justify a finding of contempt under the Judiciary Law. In short, it would seem unreasonable to conclude that the husband, acting according to the unequivocal command of the legislature in the Domestic Relations Law, could be held in contempt for failing to abide by an ambiguous command from the Appellate Division.
Second, a finding of contempt requires clear and convincing evidence that the husband failed to comply with the Appellate Division directive. (Penavic v Penavic, 109 AD3d 648 [2d Dept 2013]; Gomes v Gomes, 106 AD3d 868 [2d Dept 2013] [the burden of proof is on the proponent of the contempt motion, *838 and the contempt must be established by clear and convincing evidence].) In order to evaluate whether there is clear and convincing evidence of a violation of the 2000 Appellate Division decision, this court needs to resolve what the phrase “provide” means in the context of the Appellate Division’s direction to “provide coverage” to the wife. Under the wife’s view, as argued by her counsel after the proofs were closed, the husband was obligated to “get” the medical insurance coverage for the wife, presumably requiring him to apply for the coverage, have the wife’s application approved and then pay for the insurance. Under the husband’s view, the wife was obligated to apply for the coverage — file the necessary applications and obtain the approval for coverage — and the husband would finance the coverage by paying the premiums.
The husband argues that he did “provide” the wife with access to health insurance throughout the period after the divorce. The husband testified that he paid all the Preferred Care premiums submitted to him when due and the canceled checks attest to these payments. As noted earlier, the husband testified that when the wife went to work in Maryland in 2007, she changed health insurance carriers and the husband paid for health insurance for four months in 2007. He also testified that because the wife’s employer provided health insurance during this time, he was not required to pay the entire premium, but only the wife’s share.[8] He paid the wife’s share of the premiums when she worked in Maryland and the records substantiate this claim. He testified that, when his ex-wife lost her coverage shortly thereafter, he asked her to forward him a bill for her health coverage and testified that he told her he would pay it. He testified that the wife never sent him a bill and therefore, because he did not know who to pay, he never made any payments. This court credits the husband’s testimony. The evidence establishes that the wife had moved away from Rochester and it is eminently reasonable that the husband would only pay for insurance or other costs when the wife sent him the bill. Given the history of animosity between the parties in this case, this court can understand that the husband, with an obligation to pay for health insurance, would insist on paying the costs directly to the insurer rather than forward a check to the wife.
In this court’s view, the husband’s approach — paying the insurance upon receipt of a bill and offering to pay further in *839 suran.ee when a bill was forwarded — comports with the prior Appellate Division directive to “provide” medical insurance. The wife’s claim — that “provide” be interpreted to require the husband to apply for and obtain the coverage — is contradicted by undisputed facts. The wife, after the divorce, did — on at least one occasion — apply for and obtain medical insurance coverage from her employer. When she relocated in Maryland, the wife applied for and secured health insurance coverage without the assistance or intervention of the husband. There is no evidence that the husband applied for or obtained the health insurance in Maryland. The wife never suggested that the husband was obligated to apply on her behalf for health insurance from her Maryland employer. The proof establishes that she asked him to pay the premium for coverage in Maryland that she obtained on her own after their divorce — and he did. When she lost that coverage and apparently still lived in Maryland, there is no suggestion by the wife — or any other proof — that the husband was obligated to apply for medical insurance coverage for the wife in New York or elsewhere. Instead, the proof, based on the Maryland experience, circumstantially suggests that both parties engaged in a pattern or practice that the wife, regardless of where she lived or what she was doing, would apply for the coverage and demand that the husband finance the payments, as he had done prior to 2008.
Furthermore, it seems improbable that the husband, having had little to no contact with his ex-wife, would be in a position to file an application for medical insurance on behalf of his wife in New York when she lived in Maryland. An applicant for health insurance would be required to furnish medical history and doctor’s information and the husband, given his apparent estrangement from his ex-wife, would have little likelihood of knowing these facts. The fact that the wife lived in Maryland would seem an obvious obstacle to the husband’s ability to apply for and receive medical insurance for her through a New York insurer. In view of these facts, it seems illogical to interpret the judicial command to the husband to “provide” health insurance as requiring the husband to initiate an application for health insurance under any circumstances, much less in an instance in which the wife is working hundreds of miles away in another state.
In contrast, the husband’s approach — “send me the bill and I’ll pay it” — seems to represent a realistic interpretation of the requirement that he “provide” health insurance. The husband’s *840 approach comports at least in part with the prior order in Justice Affronti’s 1999 decision after the divorce trial in this case. In that opinion, the Justice noted that the wife had “requested financial contributions by the plaintiff [husband] toward her health insurance.” Justice Affronti was apparently asked to have the husband financially contribute to the medical insurance costs. There is no suggestion in Justice Affronti’s 1999 opinion — or the Appellate Division in 2000 — that the husband was obligated to apply for coverage on behalf of his wife. The 2013 appellate decision also does not direct that the husband apply for the coverage: it simply requires that he “provide” the coverage.
Finally, the documentary proof in this case justifies the husband’s — “pay the bill when I get it” — approach to “provide” medical insurance. The attorneys stipulated to the admission of the husband’s checks that evidence payments for his wife’s medical insurance until the end of calendar year 2007. The checks are paid to Preferred Care, a Rochester-based health maintenance organization. In September 2007, when the wife moved to Maryland, the husband paid a bill to Blue Cross/Blue Shield of Maryland, the state in which the wife worked. There is no evidence detailing how the wife obtained this coverage. But, it seems likely that the wife applied for this coverage in Maryland and sent the husband the bill — and he paid it. The only conclusion, under these facts, is that the wife applied for coverage in Maryland, incidental to her employment, secured the coverage and asked her husband to pay for it. He paid four installments for that coverage — through the Maryland insurer— until the end of 2007. The husband testified that when he received no further bills, he assumed the wife had secured coverage elsewhere. This court is unwilling to accept the husband’s assumption: he could not so easily shirk his obligation to provide coverage by simply assuming that the wife was covered by someone else. But, similarly, based on the experience of the parties prior to 2008, the wife had some further obligation: she was required to apply for coverage and forward the bill for coverage to the husband which is what had occurred for several years before the end of 2007. Importantly, there is no evidence before this court that the wife, after 2008, obtained health insurance coverage, sent the bill to her husband and he failed to pay it. The wife stopped sending the husband bills for the coverage and he never asked for health insurance bills from the wife.
In balancing these respective obligations, this court is struck by the lack of communication between these former spouses, al *841 though it appears that this couple remain haunted by antagonism that surfaced during their original divorce. Justice Affronti, in his original opinion, stated: “this court finds it difficult to recall any matrimonial or custody litigation where the attitudes and belligerence between the parties is so readily apparent.” However, when all the facts are analyzed, there is no clear and convincing evidence that the husband failed to “provide” medical insurance because there is no evidence that he failed to pay any premium for the wife’s medical insurance when she presented him with a bill for the coverage and therefore, there is no “clear and convincing” evidence that he failed to comply with the Appellate Division order to “provide” similar health insurance.
For these reasons, this court declines to find the husband in contempt for failing to follow the dictates of the Appellate Division decision in 2000.
2. The Wife’s Claim for the “Same Medical Insurance Coverage”
The recent Appellate Division decision orders this court to have the husband “provide” the “same medical insurance coverage” that was “provided” by the husband to the wife during the marriage. First, in order to establish the “same” coverage, there must be evidence of the pre-divorce medical insurance coverage. The word “same” assumes that the future medical insurance, which the Appellate Division wants this court to order, will be “comparable, analogous, indistinguishable” from the medical insurance coverage provided during the marriage.[9] Counsel for both parties agreed, at the commencement of the hearing, that the wife had the burden to prove, by the preponderance of the evidence, the extent and nature of the “medical insurance coverage” provided by the husband during the marriage.
In the record before this court, there is no credible proof of the type or amount of coverage that the wife obtained through her husband during the marriage. There are no prior insurance contracts or summary plan descriptions of benefits from either a health insurance provider or the husband’s prior employer. The wife’s counsel produced a purported medical insurance contract from the period of the marriage, but the court declined, in the face of a hearsay objection, to admit the document. The *842 wife never called the husband during her direct case to discuss the nature and extent of the pre-divorce medical insurance coverage. In short, at the close of all proofs, there is no documentary or other admissible evidence of the exact nature and scope of the “medical insurance coverage” provided by the husband during the marriage. If there is no “medical insurance coverage” to be compared to — as the word “same” requires— then this court cannot comply with the Appellate Division’s direction.
During the summations at this hearing, the wife’s counsel noted that the wife had testified that she had “good coverage” during the period of her marriage and for several years thereafter. This court has no idea what constitutes “good coverage” other than the wife’s suggestion that she had it. This court cannot make a reasonable award or directive for any future coverage because it has no evidence of the medical coverage in place during the marriage or after the divorce, when the husband paid for it directly. The wife has simply failed to meet her burden to establish what coverage was available during the marriage and in the absence of that evidence, this court refuses to speculate on what constitutes “the same medical insurance coverage” in the future especially when the term is applied to what the court perceives as the exceedingly complex field of health and medical insurance.
This court has also considered issuing an order for the husband to simply “provide good coverage” and have the husband submit an appropriate health plan to the court for a review. However, to do so would ignore the realities of a hearing in which a party bears the burden of proof and must present admissible evidence to support its claims. The Appellate Division in this case ordered this court to order the husband to provide the “same medical insurance coverage” extant in the past into the future. Consistent with stare decisis, this court intended to do just that. But, because there is no evidence, at this stage, of what constitutes the “same medical insurance coverage” that the couple shared during their marriage, this court, while duty bound to follow the Appellate Division’s command, declines to order a remedy unjustified by the proof.
The wife has failed to meet her burden of proof on the extent and scope of “medical insurance coverage” provided by the husband during the marriage and therefore no award for health *843 coverage, from the date that husband discontinued paying for submitted premiums until the date of this decision, is justified.[10]
3. The Wife’s Claim for Unpaid Health Expenses
The wife makes a claim for unpaid medical and health bills that accumulated after the husband stopped paying for the wife’s health insurance. During the trial, the wife’s counsel presented a packet of papers that her attorney identified as the wife’s health care bills that were unpaid after 2008 and which would have been paid if the husband continued the wife’s health insurance. When the wife’s attorney sought to introduce the package of bills through testimony of the wife, husband’s counsel objected, claiming that there was no foundation for the admission of the records. The records were not subpoenaed and did not contain an attestation under CPLR 4518 (c). The bills were records compiled by providers, according to the wife’s counsel. Both counsel acknowledge that the proffered records are business records of the providers and when the husband’s counsel objected to the admission of the documents and to any testimony by the wife on the contents of the records based on the hearsay rule, the court sustained the objection. (See Matter of Samantha M. [Allison Y.], 112 AD3d 421, 422 [1st Dept 2013] [records were properly admitted under the business record exception to the hearsay rule based on certification that the document “was within the scope of the entrant’s business duty to record the act, transaction or occurrence sought to be admitted and that each participant in the chain producing the record was acting within the course of regular business conduct” (internal quotation marks omitted)]; see also Matter of Leon RR, 48 NY2d 117, 122 [1979].) The husband also later testified that he had never been given the alleged bills offered to the court and the wife, prior to commencing this proceeding, had never forwarded any bills for payment to him. There is no evidence that the wife ever submitted the allegedly unpaid bills to her husband prior to commencing this proceeding. In the absence of any documentary evidence or other evidence of the amount of the bills, that they were incurred by the wife for treatments that would have been covered by medical insurance in effect during the term of the marriage, that the services were *844 medically reasonable or necessary and that the fees charged were usual and customary fees for the supplied services, the court cannot make any award for these expenses. (Kuhn v Kuhn, 134 AD2d 900 [4th Dept 1987]; Bains v Bains, 308 AD2d 557 [2d Dept 2003].)
4. The Claim for Attorney’s Fees
The wife’s attorney seeks fees and costs for pursing this matter from the initial motion, through the appeal to the Appellate Division and before this court. Initially, the wife’s attorney has no claim to fees under the original divorce application. The judgment of divorce was granted after a trial and there is no language in the judgment suggesting that legal fees would be appropriate if the husband violates the judgment.[11] The wife’s counsel also argues that the contempt action under the Judiciary Law justifies fees. However, as noted above, this court declined to find contempt in this case. (Moore v Davidson, 57 AD3d 862 [2d Dept 2008] [on a motion to punish for civil contempt, a finding of civil contempt is the prerequisite for imposing attorneys’ fees].)[12]
In the absence of a finding of contempt and the lack of a basis for an award of fees under the prior judgment, this court is left with only one other source for such fees: Domestic Relations Law § 238, which contains a rebuttable presumption to award fees in favor of the lesser-monied spouse.[13] This provision also permits this court to award fees in any case brought to enforce any order of this court or the Appellate Division. The statute further states that counsel fees should be awarded as “justice requires[,] having regard to the circumstances of the case and of *845 the respective parties.” (Domestic Relations Law § 238.) The legislature required that the fees be apportioned “to assure that each party will be adequately represented.” (Id.) In construing this statute, the New York courts have granted trial courts broader discretion than provided in section 237 of the Domestic Relations Law. (Cheruvu v Cheruvu, 61 AD3d 1171, 1174 [3d Dept 2009]; Matwijczuk v Matwijczuk, 290 AD2d 854 [3d Dept 2002] [Domestic Relations Law § 238 authorizes a court in its discretion to award counsel fees in an enforcement proceeding to compel the payment of money and unlike Domestic Relations Law § 237, does not expressly require a court to consider the circumstances of the case or the parties in fashioning an award of counsel fees].)
The New York courts have broadly read the legislative command to shift fees in matrimonial matters to ensure some parity in divorce-related litigation. (Leonard v Leonard, 109 AD3d 126 [4th Dept 2013]; Hackett v Hackett, 34 Misc 3d 1233[A], 2012 NY Slip Op 50356[U] [Sup Ct, Kings County 2012]; DeCabrera v Cabrera-Rosete, 70 NY2d 879 [1987] [award of attorneys’ fees should be based upon the relative financial circumstances of the parties, the relative merits of their positions, and the tactics of a party in unnecessarily prolonging litigation]; Matter of Linger v Linger, 108 AD3d 569 [2d Dept 2013].)[14] The legislature, in creating a presumption for an award of fees in favor of the lesser-monied spouse, made no reference to the eventual outcome of the attorney’s work for the less-monied spouse. The statute does not require that the lesser-monied spouse have been a “prevailing party” on the issues before the court in order to justify an award of fees.[15] There is no legislative require *846 ment that the party applying for fees has even “substantially prevailed” before this court. Furthermore, read in its entirety, the statute suggests that when New York courts consider awarding fees, “prevailing” is not as important as “adequate representation.” First, the legislature, in section 238, states the purpose of granting counsel fees is “to enable the . . . party to carry on . . . the action.” The importance of adequate representation is referenced twice in section 238: the legislature said the courts should “assure that each party [is] adequately represented” and further any awarded fees should “enable adequate representation from the commencement of the proceeding” (emphasis added).
The language in section 238 creating the rebuttable presumption favoring fees and the language regarding the primacy of “adequate representation” were part of the 2010 amendments to the statute. (L 2010, ch 329.) The sponsor’s memorandum details the rationale for making these fees available to “each party,” irrespective of the merits of a party’s claim:
“Given the importance of pendente lite counsel fees, and the frequency of financial imbalance between parties to matrimonial proceedings, it is inappropriate to place the burden upon a non-monied spouse to justify it. Therefore, it is important for the Legislature to revise the statute, as proposed, to create a rebuttable presumption that such relief should be granted to the non-monied spouse. This measure requires that in a matrimonial action an order for pendente lite counsel fees and expenses should be granted at the outset of the case to ensure adequate representation of the less monied spouse from the commencement of the proceeding, and it is left to the affected parties to show why, in the interests of justice, the order should not be made. This will better address today’s economic and social *847 realities, and will help ensure that no party to a matrimonial case is strategically at [a] disadvantage for want of resources to pursue or defend the case.” (Assembly Sponsor’s Mem in Support, Bill Jacket, L 2010, ch 329 at 16-17.)[16]
In short, by declining to require “prevailing party” status for a spouse under section 238 of the Domestic Relations Law, the legislature has suggested that protecting a spouse’s right to assert their interest during the litigation is more important than the result.[17]
In considering this question, this court has extensively researched New York law on whether this court’s broad discretion can — or should — extend to awarding counsel fees under section 238 of the Domestic Relations Law to a non-prevailing party. This court can find no authority on either side of this question. To some degree, this court faces the same dilemma lyrically set forth in the court’s original reference to the Captain’s song in H.M.S. Pinafore: while logic suggests a non-prevailing party should be told “no, never” when requesting post-hearing fees, the strong recently-enacted legislative presumption to award fees to the less-monied spouse to permit a party to “carry on” matrimonial litigation and the lack of a statutory requirement for prevailing party status as a precondition to awarding fees suggests the non-prevailing party should be told, instead, that counsel fees, while “hardly ever” granted to non-prevailing parties, are nonetheless permissible. In this court’s view, stretching the elasticity of discretion under section 238 and bowing to the legislative command to permit a less-monied spouse to “carry on” her claims, this case is one of those “hardly ever” circumstances where some counsel fees may be justified.
Having concluded that an award of counsel fees to the non-prevailing spouse is permissible, this court must still evaluate the equitable factors that decide whether a fee is appropriate and, if so, what amount is justified. Importantly, this court also notes that even if the statute’s silence on prevailing party *848 status suggests fees can be awarded to a “non-prevailing party,” the statute fails to give this court any guidance on determining the reasonableness of the fees to the wife’s counsel, when — as in this case — the party requesting fees has not prevailed on any substantive issue — the contempt finding, the “same medical coverage” issue or the payment for allegedly accrued bills— before the court.[18] Without any statutory guidance, this court looks to the equitable factors articulated previously to determine whether to grant a fee and, if so, the amount of such a fee award. The “relative merit” or lack of merit to the wife’s position is only one among many equitable factors to consider. (DeCabrera v Cabrera-Rosete, 70 NY2d 879 [1987].) In this case, the wife’s attorney, with 41 years experience, did take this case when the wife could not afford substantial fees, accepted a minimal retainer, won an appeal to the Appellate Division and spent time in trial and preparing this case. While crediting the attorney’s perseverance, nonetheless, at trial, the proof he presented on behalf of the wife failed to meet the burden of proof to sustain his client’s claims. Therefore, while the wife’s poor financial condition and the attorney’s working for a long period without payment suggest a substantial fee, her failure to prevail based on the evidence offered at trial suggests just the opposite. In further balancing equities identified by the Court of Appeals in DeCabrera v Cabrera-Rosete, there is no evidence in this case of any obstreperous tactics by the husband to delay the resolution or further strain the wife’s financial resources.[19]
This court has also reviewed the wife’s attorneys affidavit for fees and costs incurred prior to trial, which counsel stipulated this court could do without further trial proof. The court notes that the attorney’s time spent on this matter is reasonable. His hourly rate — $160 per hour — is eminently reasonable and fair. His total claim for fees exceeds $20,000 which is reasonable *849 given the volume of work he performed.[20] A further factor tilting in favor of granting counsel fees to the wife is that the husband, as the more-monied spouse, certainly can afford to pay reasonable fees to his wife’s counsel.
In the swirl of equities surrounding this question, the court notes that any award of substantial fees to the wife’s counsel when the wife has not prevailed on the substance of any issue before the court poses a challenge to this court’s sense of equity and fairness. The husband can argue that it is unfair if he is required to pay fees when his wife never prevailed. In addition, the upshot of requiring the husband to pay fees would be that his wife’s attorney is paid a significant portion of his fees but the wife recovers nothing and is left with a very sizable bill — in excess of $10,000 — for outstanding fees. Conversely, by denying fees, this court would add a further financial burden to a litigant who not only has less income and assets but faces unpaid medical and legal bills and other future costs. A final factor substantially influences this court: the difference in timing of the initial request for fees and the posttrial request for fees. The wife’s counsel requested fees when he filed the order to show cause seeking to enforce the Appellate Division decision six months ago. At that time, this court deferred granting fees, pending the outcome of the hearing. When the order to show cause was filed, the wife, under section 238, had a clear and undeniable claim for fees: her claim had the merit of an Appellate Division order behind it and she was then — as she is now— undisputedly the lesser-monied spouse. Given the clear and unmistakable legislative intention in the recent amendments to section 238 to encourage pendente lite awards to “assure that each party shall be adequately represented,” the wife had an almost undeniable claim to attorney fees prior to the trial, even though at that time it would have been impossible to predict the trial outcome. To deny her fees now — at the conclusion of the hearing — when she would have been entitled to fees at the time of the original order to show cause — six months before the hearing — violates this court’s ultimate sense of fairness and does not accord with the legislative commands in section 238. Under all these circumstances and after balancing all of the equities, this court concludes that while counsel fees to a non-prevailing party may be “hardly ever” granted in New York *850 matrimonial litigation, the unique facts in this case justify an award to the wife’s counsel of $12,500 as reasonable legal fees.
With respect to the request for costs, the court notes that the wife, in her original order to show cause, sought reimbursement for expenses in this proceeding. The wife, in her original order to show cause in 2011, incurred fees for filing and service of the motion, a cost of $85. These costs are awarded to the wife. The wife paid assorted expenses for the notice of appeal, making copies of the record, the appellate filing fee and mailing the record and brief. She seeks those costs before this court. In its 2013 decision, the Appellate Division denied costs to the wife. (104 AD3d at 1182.) This court cannot award disbursements for an appeal when the Appellate Division has denied costs. (CPLR 8301.) Therefore, any costs and disbursements, as requested before this court relating to the appeal, are denied by direction of the Appellate Division. The wife also seeks $45 for filing the current motion and $5.80 for the mailing cost. Because the wife did not substantially prevail at the hearing related to the motion filed in 2013, the court declines to award these costs and disbursements.
The wife’s motion for contempt is denied. Her request for an order directing the husband to “provide” the “same” health insurance coverage for the period from 2008 until the date of the hearing is denied. Without proof of what was provided during the marriage, this court cannot direct any coverage for the future. The wife’s claim for a judgment for her unpaid medical bills is denied because there is no admissible proof of any reasonable and necessary expenses incurred or the reasonable cost of such services. The wife’s claim for legal fees is granted and her counsel awarded $12,500 from the husband and she is awarded $85 in costs. These fees should be paid within 40 days after the entry of an order in this case in the Monroe County Clerk’s office.
All other claims for relief or cross claims for relief are denied.

. The sequence from H.M.S. Pinafore runs as follows:
“Captain.
“Though related to a peer,
“I can hand, reef, and steer,
“And ship a selvagee;
“I am never known to quail
“At the fury of a gale,
“And I’m never, never sick at sea!
“Chorus.
“What, never?
“Captain.
“No, never!
“Chorus.
“What, never?
“Captain.
“Hardly ever!
“All:
“He’s hardly ever sick at sea!
“Then give three cheers, and one cheer more,
“For the hardy Captain of the Pinafore!” (William S. Gilbert & Arthur Sullivan, H.M.S. Pinafore, Act I, I am the Captain of the Pinafore [1878].)

. In its decision, the Appellate Division noted that the husband did not “make a proper application to modify” the 2000 decision. (104 AD3d at 1183.) There is no motion to further modify the Appellate Division 2000 decision before this court currently

. From this court’s point of view, the relief sought in the May 2, 2013 order to show cause is nearly identical to the relief requested in 2012. Hence, in considering the 2013 order to show cause, this court is reviewing the same issues remanded by the Appellate Division in its 2013 decision.

. Importantly, the wife’s testimony focused on the “medical insurance” provided during the marriage and there was no proof regarding the medical insurance provided to the wife after the divorce and until 2008, when it is undisputed that he discontinued paying for any medical insurance premiums.

. The court was never presented with any subpoenas issued by the wife for production of documents from Preferred Care or the husband’s employer, Rochester Institute of Technology.

. In this court’s decision, reversed by the Appellate Division, this court noted regarding the wife’s condition that while the Appellate Division in 2000 described the wife’s medical condition as permanent, Justice Affronti, who presided over the trial, described Ms. Lomaglio’s “physical difficulties” as remaining “somewhat constant” since the time of the divorce, “without any change for the worse.” Her condition, the lower court concluded in 1999, did “not prevent her from maintaining regular full-time employment.”

. In its prior opinion on this matter, this court held that the Appellate Division’s use of the phrase “permanent” was ambiguous in the context of the reported decision and was used to only describe the wife’s infirmities and was not intended to create a requirement for the husband to pay health insurance costs beyond the expiration of his maintenance. While the Appellate Division in 2013 reversed this court on other grounds, it did not review whether its prior use of the word “permanent” — as a description of the wife’s then current infirmities — was ambiguous as applied to the “permanent” medical insurance obligation.

. The 2000 Appellate Division decision contains this exception. (273 AD2d at 824.)

. “Same” is defined as “resembling in every relevant respect” or “conforming in every respect.” (Merriam-Webster Online Dictionary, same [full definition], available at http://www.merriam-webster.com/dictionary/same [accessed Dec. 4, 2013].)

. There is no evidence that the wife, after 2008 and until the day of trial, applied for medical insurance that she considered “the same” as she had during the marriage, obtained the coverage, submitted the premium to the husband and the husband declined to pay it. If such evidence existed, the determination of this court might be substantially different.

. In the original trial court opinion in 1999, the trial court denied the wife’s request for fees.

. [6] As another alternative, the wife’s attorney, in his trial brief, alleges that the husband can be required to pay counsel fees if the court finds that his failure to pay for medical insurance was “willful.” (Domestic Relations Law § 237 [c].) The wife cites Matter of Powers v Powers (86 NY2d 63 [1995]) in support of this conclusion. In that case, the Court of Appeals resolved the willfulness required under section 454 of the Family Court Act, which contains different language from section 237 (c) of the Domestic Relations Law. However, based on the discussion in this opinion regarding the husband’s willingness to pay medical insurance premiums when proffered by his wife and his reasonable claim, based on a statute, that his insurance obligations lapsed when his maintenance payments ended, this court declines to hold that his failure to pay health insurance was willful under section 237 (c).

. The statements of net worth from both parties were admitted at trial and the husband is, by a significant margin, the more monied spouse.

. In S.P. v F.O. (20 Misc 3d 1104[A], 2008 NY Slip Op 51217[U] [Sup Ct, Nassau County 2008]), the court set out other factors to be considered. (See Farrell v Cleary-Farrell, 306 AD2d 597 [3d Dept 2003] [the nature and extent of services rendered and the complexity of issues involved]; Sclafani v Sclafani, 178 AD2d 830 [3d Dept 1991] [the ability of each spouse to pay their own counsel fees]; Zema v Zema, 17 AD3d 360 [2d Dept 2005] [whether an equitable distribution award was made]; Kavanakudiyil v Kavanakudiyil, 203 AD2d 250 [2d Dept 1994] [and the earning power and assets of the parties].) The “equitable distribution” factor is not relevant here but the remaining factors favor an award of counsel fees to the wife.

. The New York Legislature has conditioned an award of attorneys’ fees on “prevailing” in litigation in other contexts. (See e.g. Agriculture and Markets Law § 308-a [2] [a]; CPLR 904 [d] [II].) The New York State Equal Access to Justice Act (EAJA) provides that “a court shall award to a prevailing party, other than the state, fees and other expenses incurred by such party in any civil action brought against the state, unless the court finds that the *846 position of the state was substantially justified or that special circumstances make an award unjust” (CPLR 8601 [a]; Matter of New York State Clinical Lab. Assn, v Kaladjian, 85 NY2d 346 [1995]). An award of attorney’s fees under the EAJA is generally left to the sound discretion of the trial court. (Matter of Graves v Doar, 87 AD3d 744, 746 [2d Dept 2011].) To merit an award of fees under the EÁJA, the Court of Appeals requires a plaintiff to succeed in large or substantial part by identifying the original goals of the litigation and by demonstrating the comparative substantiality of the relief actually obtained. (Matter of New York State Clinical Lab. Assn, v Kaladjian, 85 NY2d at 355.) If this “substantiality” test for prevailing were applied here, the wife in this case would not merit any fees.

. Governor David A. Paterson, in signing the bill into law, made the same observation: “The bills would help ensure representation for lower income individuals, reduce litigation costs and ease the burden on the parties in what is inevitably a difficult and costly process.” (Governor’s Approval Mem, Bill Jacket, L 2010, ch 329 at 6.)

. A strong negative inference buttresses this conclusion: if the legislature had intended that an award of fees be exclusively reserved to the prevailing party, it would have specifically said so.

. This court notes that at no point before or during the trial did the wife’s attorney suggests that his advocacy, trial preparation or the production of documents from third parties was impacted by the lack of a pendente lite award of counsel fees.

. The husband alleged, right from the start, a reasonable defense under the actual terms of section 236 (B) (8) (a) of the Domestic Relations Law, continuously argued that he had never declined to pay a proffered invoice for medical insurance and further engaged in extended settlement discussion with the wife’s counsel after the Appellate Division decision. The court declines to draw any adverse inference from the husband’s litigation posture in determining a reasonable fee in this case.

. The attorney’s time records indicate his total fees for all services exceed $28,000.